NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0659n.06

Case No. 16-2668

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Nov 29, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| HAYES BACALL, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CATHLEEN STODDARD, Warden, | ) | DISTRICT OF MICHIGAN |
| Respondent-Appellee. | ) | |
| | ) | |

**O P I N I O N**

**BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Hayes Bacall asks us to reverse the district court's refusal to issue a writ of habeas corpus under 28 U.S.C. § 2254. Bacall was convicted in a Michigan court of first-degree, premeditated murder. Although the prosecutor committed a serious error during his rebuttal argument, we are constrained by the standards imposed by the Supreme Court and the Antiterrorism and Effective Death Penalty Act ("AEDPA"). We **AFFIRM** the judgment of the district court.

**I**

Bacall treated his nephew, Saif Jameel, like his own son. He loved Jameel so much that he loaned him $400,000 after taking out multiple equity loans against his residence and business.

These loans were secured by nothing except for Bacall's trust and sense of family obligation. Unfortunately for both Bacall and Jameel, this feeling was not mutual.

**A**

Initially, Jameel paid the monthly interest the banks were charging Bacall on the home-equity loans. Jameel paid nothing on the principal, and in time, stopped making the interest payments too. Eventually, Bacall discovered that Jameel's creditors had multiplied, and that he owed close to $1 million to various individuals. Bacall repeatedly pleaded with Jameel to start making payments, out of respect for his promise and the impact the debt was having on Bacall's family. Jameel essentially told his uncle that he would be lucky to get anything.

Welching on his debts was not Jameel's only flaw. Jameel was known to draw his concealed firearms on anyone who made him too angry. Bacall testified that Jameel once used a shotgun to chase off a group of people who tried to cash a check that did not belong to them. He also once stuck his pistol in the face of a valet who told him he couldn't park in the drive-in loop of a funeral venue, saying, "[D]o you know who you're talking to[?]" The valet fled in terror.

After frequent cajoling, Jameel wrote his uncle a $2,000 check. However, in what must have been a cruel joke, the check was postdated by about thirty days. Bacall, angry, took the pistol he used for protection in his cash-checking business and went to visit Jameel at his BP gas station in Troy, Michigan. On his way to the station, he called Jameel about ten times. Jameel did not answer.

When Bacall arrived, there were two people at the gas station. One of them (Slieman Bashi) was a longtime friend of both Bacall and Jameel. Another witness (Danielle Iverson) watched Bacall go into the back office where Jameel worked. Eventually, both witnesses heard gunshots. Bacall exited the office, shook Bashi's hand, went outside, and called 911. When the

officer arrived, he observed that Bacall "had an eerie calmness to him." He asked Bacall what had happened, and Bacall said, "I shot my nephew, he owes me $400,000." The officer arrested Bacall, secured the empty gun, and placed him in the police cruiser.

Bacall's English was not the best, and the officer struggled to discern whether Bacall understood his *Miranda* rights. At one point, the officer asked, "Okay you know your rights, right?" Bacall responded with a blunt, "Yes I'm right." After the officer tried to clarify what he meant by saying, "Constitutional rights?", Bacall again responded by saying, "Yes everything's right." Bacall later testified that "[t]here are a lot of phrases that, you know, I don't understand," and that he had completely misunderstood what the officer was asking. After doing his best to Mirandize Bacall, the officer drove him to the police station. During the drive, Bacall received a phone call from Jameel's brother (Samir). The entire conversation was not translated to English, but from the parts that were, it is clear that Bacall confessed to killing Jameel and (at one point) insulted Samir and Jameel's sister.[1]

**B**

The State of Michigan charged Bacall with first-degree, premeditated murder. While he was in jail awaiting trial, Bacall made at least seven phone calls where he claimed that he shot Jameel in self-defense. He continued to insist upon this defense at trial, and testified on his own behalf. On direct examination, he said that he was afraid of Jameel because of Jameel's reputation, and that when he arrived at the gas station, Jameel got angry and threatened to "put it in your ass." Bacall testified that this anger, combined with the small size of Jameel's office and the fact that Jameel kept weapons in the room, caused him to feel afraid: "I knew I was going to die. I was, I felt in danger. Because he had pulled a gun on, on tons of people[] with no reason.

---

[1] The insult apparently does not translate well into English, but runs something like: "I just fucked his sister up."

So how about, how about a person whom, whom he owes $400,000—what do you think he will do to him[?]" After seeing Jameel reach for his cabinet, Bacall fired.

Although the gas station had video surveillance, there was no camera in Jameel's office. Iverson did not see the shooting, and Bashi gave inconsistent testimony about what happened. Ballistics and forensic evidence were equally inconclusive. Samir—Jameel's brother—testified that Bacall had frequently threatened to kill Jameel for defaulting on his debt by "empty[ing] the gun" into Jameel. But Samir admitted on cross-examination that he never reported any of these threats to the police, and his motive to lie is obvious.

During closing arguments, the prosecutor and the defense attorney focused on Bacall's mental state at the time of the shooting. In rebuttal, the prosecutor told the jury:

> In English, the defendant says he killed his nephew for $400,000. That's the first thing out of his mouth when the officer asked him what happened. . . . Defendant never says self-defense to the police officer and the officer gives him three separate chances. . . . [A]fter the *Miranda* rights, the officer asks him again about shooting a nephew. He says—well, he hasn't given me anything in about a year. He never says self-defense or even anything like self-defense. And on the witness stand, defense counsel asked the defendant—well, why did you tell the officer, you know, you shot him because of $400,000—and the defendant slips up, he says—because that was the main reason at the time. So practice though he may, the truth shines through. *Now, at trial is the first time the defendant says self-defense*.

This was false, and the prosecutor knew it. The record shows that the prosecutor was well-aware of the seven calls from jail where Bacall claimed self-defense. In obedience to the judge's instructions, defense counsel raised his objection to this statement after the jury had retired to deliberate. The trial judge overruled the objection and refused to give a curative instruction or to grant a mistrial.

During deliberations, the jury sent a note to the judge. The note read: "Can the jury decide on a verdict of a lesser cause when they are unanimous, even though some may feel a

stronger verdict is what they believe?" The judge, after another objection from the defense,[2] instructed the jurors that they should decide the case on whatever charge they could agree upon, that they could go back and forth between first-degree murder and voluntary manslaughter, that they should all keep their minds open to persuasion, but that none of them should give up their beliefs just for the sake of agreement. The jury also requested to see the gun used in the killing, and the judge—nervous about sending a gun back to the jury room—permitted the jury to examine the weapon in the jury box for a few minutes. Although the jurors talked amongst themselves, their statements were not recorded, and nothing of note was said in the courtroom during this time.

The jury deliberated for two afternoons and a morning. After the foreperson told the court that "this was not an easy decision and we . . . thought about it," the jury found Bacall guilty of first-degree murder.

The Michigan Court of Appeals affirmed Bacall's conviction. *People v. Bacall*, No. 306269, 2013 WL 951084 (Mich. Ct. App., March 5, 2013). On appeal, Bacall raised three issues relevant for our purposes: (1) that the jury's note to the judge triggered double-jeopardy protections because it indicated that the jury was unanimous on a lesser charge; (2) that the jury's brief, public deliberation was plain, reversible error; and (3) that the prosecutor made several improper statements[3] during argument that deprived him of a fair trial. *Id.* at *1–5.

The court of appeals rejected all three claims. On the first claim, the court found that the jury had not made a decision because it had asked a question instead of actually returning the verdict form. On the second, the court found that although the jury should not have been

---

[2] Bacall's counsel claimed that this was a decision on a lesser charge, triggering the Constitution's double-jeopardy protections.
[3] In addition to the "first time" remark, the prosecutor also referred to Bacall as a "loan shark" and mentioned inadmissible evidence that Bacall had lied on his concealed-carry-permit application.

permitted to discuss the gun in public, Bacall had not objected to the public deliberation and had not shown any prejudice under *United States v. Olano*, 507 U.S. 725 (1993). On the third claim, the court found that most of the prosecutor's statements were proper. However, it reprimanded the government for lying about the jail phone calls, finding that this was "highly inappropriate" and stating that the trial judge should have given a curative instruction to the jury. Nevertheless, the court affirmed the conviction because the "overwhelming evidence" against Bacall resulted in a fundamentally fair trial. *Bacall*, at *3–5. The Michigan Supreme Court denied review. 843 N.W.2d 147 (Mich. 2013) (mem.).

## C

Bacall then filed this § 2254 petition in federal court. The district court denied the petition, holding that Bacall's claims were either meritless or barred by the AEDPA standard of review. However, it granted a certificate of appealability on the three claims identified above. Bacall timely appealed.

Because this is a habeas case challenging a state-court conviction, we apply the rules prescribed in 28 U.S.C. § 2254. When a state court has decided a federal issue on the merits, we may issue the writ only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if it "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). We presume that a state court decides all claims presented to it. *Harrington v. Richter*, 562 U.S. 86, 99 (2011); *Johnson v. Williams*, 568 U.S. 289, 298–99 (2013).

Bacall contends that his conviction resulted from an "unreasonable application" of federal law. A state court's resolution of a federal issue is unreasonable under this standard only

if it "was so lacking in justification that [it committed] an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. In other words, the mistake cannot simply be error, or even clear error—instead, it must be "objectively unreasonable." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). Moreover, when answering this question, we may only look to the specific holdings of the U.S. Supreme Court. *Id.* In a recent prosecutorial-misconduct case, the Court chastised us for applying our own interpretations of its cases to habeas petitions. *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012).[4]

## II

The district court's thorough analysis of this case leaves little for us to say on most of the issues. We agree completely with Judge Michelson's evaluation of Bacall's Confrontation-Clause, double-jeopardy, and public-deliberation arguments, and we adopt her opinion as our own in those respects. We only add one observation to the district court's opinion on the public-deliberation issue.

We recently clarified that plain-error review can be an adjudication on the merits under AEDPA. *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017). Thus, even though the district court assumed that AEDPA deference applied in light of our conflicting precedent, this assumption is unnecessary, because the Michigan court's plain-error review "conduct[ed] [a] reasoned elaboration of [the] issue under federal law." *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009); *Bacall*, at \*5–6 (discussing *Olano*, 507 U.S. at 738). Thus, AEDPA deference forecloses Bacall's public-deliberation claim; neither *Olano* nor any other Supreme Court case

---

[4] All of the Sixth Circuit cases Bacall cites in favor of granting the writ predate the Court's directives in *Harrington*, *Parker*, and *White*. *See Slagle v. Bagley*, 457 F.3d 501 (6th Cir. 2006); *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000); *Boyle v. Million*, 201 F.3d 711 (6th Cir. 2000). They are therefore of doubtful value to us.

establish that brief public deliberation by a jury is structural error.  28 U.S.C. § 2254(d)(1); *Olano*, 507 U.S. at 738.

## III

As the district court recognized, the prosecutorial-misconduct claim is more difficult. The Michigan Court of Appeals held that any prejudice arising out of the concealed-carry-permit issue was cured by the trial court's instruction that arguments are not evidence (the "concealed-carry comment").  *Bacall*, at *3.  The court did, however, hold that the prosecutor committed misconduct by asserting that Bacall had not raised a self-defense claim before trial (the "first-time comment").  *Id.* at *4.  Nevertheless, the court refused to reverse Bacall's conviction, ultimately concluding that he was not deprived of a fair trial.  *Id.* at *5.

### A

The district court correctly identified *Darden v. Wainwright*, 477 U.S. 168 (1986), as the governing law.  Under *Darden*, a prosecutor's inappropriate comment during argument must be evaluated in context, and does not justify relief solely because it is "improper," "undesirable," or even "deserves the condemnation it has received from every court to review it."  *Darden*, 477 U.S. at 179–81.  Instead, such statements will only violate the constitutional right to a fair trial if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* at 181.

The generality of this standard only adds to the deference accorded to state courts under AEDPA.  *Parker*, 567 U.S. at 48; *Stewart*, 867 F.3d at 638–39.  Thus, our only task is to project the facts of this case against the facts in the Court's prosecutorial-misconduct jurisprudence to determine whether the Michigan Court of Appeals applied *Darden* unreasonably.  *See id.*  We will not (and cannot) stitch together principles from multiple related cases in order to grant relief,

even if we might do so on direct review. *See White*, 134 S. Ct. at 1705–07. In addition to *Darden*, we have identified three relevant cases. *See Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *Miller v. Pate*, 386 U.S. 1 (1967); *Berger v. United States*, 295 U.S. 78 (1935). None of these decisions support granting the writ here.

**B**

*Darden* provides a starting point. In *Darden*, the prosecutor referred to the defendant as an "animal" and said that "[h]e shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." *Darden*, 477 U.S. at 180 n.12. The prosecutor also expressed his personal wish that he could "see him sitting here with no face, blown away by a shotgun." *Id.* The Court, after finding that these (and other) comments "undoubtedly were improper," nevertheless held that "they did not deprive petitioner of a fair trial." *Id.* at 180–81.

The Court pointed to six factors that influenced its decision. First, it noted that "[t]he prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 181–82. Second, "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense." *Id.* at 182. This fact did not excuse the comments but merely served to place them in the same context in which the jury heard them. *Id.* Third, the Court observed that the trial judge expressly instructed the jury that "the arguments of counsel were not evidence." *Id.* Fourth, it noted that "[t]he weight of the evidence against petitioner was heavy," and reasoned that a strong case makes it less likely that the jury was influenced by error. *Id.* Fifth, the defense counsel intentionally withheld his objection, knowing from his long experience with the prosecutor that he would dig his own grave "if you allowed him to go on." *Id.* at 182–83 n.14. Finally, the procedural context of the trial allowed the defense to refute the

statements and place them "in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner." *Id.* at 182.

*Darden* provides only imperfect guidance. There, the chief issue was the identity of the defendant as the killer, not his motive or intent. *See* 477 U.S. at 172–74. In *Darden*, police recovered a firearm about forty feet from a car matching the description of the vehicle leaving the scene of the murders. *Id.* The car was the defendant's, and ballistics evidence removed all doubt that the gun was used to kill the victims. *Id.* at 173–74. In this context, the prosecutor's statements—referring to the defendant as an "animal" and lamenting that his face was not "blown away"—could not have added much to the heap of proof. *Id.* at 180 n.12, 182.

This case is more complicated. The chief dispute here was over Bacall's mental state, not his identity as the killer. In fact, it appears that the only significant issue at trial was whether Bacall acted in self-defense or whether he premeditated the killing. Further, the evidence presented here was far more equivocal than the evidence in *Darden*. It is clear that the jury struggled deeply with the first-degree murder count. This struggle was understandable, considering that the only eyewitness to the killing contradicted himself, that Bacall had difficulty comprehending police questions about his motives, that the video recordings were inconclusive, and that Bacall had a good reason to be afraid of the victim. This was not an open-and-shut case for the defense either: Bacall brought a gun to the scene of the crime, and a witness did testify that Bacall had previously expressed a desire to shoot the victim (although these threats were never reported). Bacall also had several opportunities to explain to the police that he acted in self-defense, but instead blurted out, "I shot my nephew, he owes me $400,000" and insulted the deceased's sister.

Thus, in some sense, this case is worse than *Darden*. The prosecutor's false statement that "at trial is the first time the defendant says self-defense" went to the heart of the case. *Bacall*, at *3. It was a direct, factual claim that the defendant had fabricated his defense at the last minute. The law recognizes the strong probative force of this sort of an accusation. *See* Fed. R. Evid. 801(d)(1)(B) (exempting from the hearsay rule statements "consistent with the declarant's testimony . . . offered to rebut an express or implied charge that the declarant recently fabricated [that testimony] . . . ."). But the Court did not grant relief in *Darden*. Further, none of the Court's post-*Darden* cases have granted relief on these grounds. Thus, for some guidance, we examine two of *Darden*'s ancestors that did grant relief.

The first case is *Miller v. Pate*, 386 U.S. 1 (1967). In *Miller*, the defendant had been convicted of brutally raping and murdering an eight-year-old girl. *Id.* at 2. The prosecutor's chief exhibit was a pair of men's underwear covered by large, reddish-brown stains. *Id.* at 3. The state court refused to let the defendant examine the underwear or have it tested. *Id.* at 2. Throughout the case, the government repeatedly asserted—through witnesses and argument— that the underwear was covered in the victim's blood. *Id.* at 2–5. This was a bald-faced lie. *Id.* at 5–7. The government knew that the underwear was actually covered in red *paint*, and not a drop of blood. *Id.* On these facts, the Court vacated the conviction because "[t]he prosecution deliberately misrepresented the truth." *Id.* at 6. The underwear was a "vital" link between the defendant and the crime, and its "gruesomely emotional impact upon the jury was incalculable." *Id.* at 4–5. The truth, in contrast, made the evidence "virtually valueless." *Id.* at 6.

Bacall also cites *United States v. Berger*, 295 U.S. 78 (1935) to support his position. In *Berger*, the Court excoriated a U.S. Attorney for repeated and persistent misconduct, including misrepresenting facts to the jury. *Id.* at 84–85. The Court also ascribed importance to

the fact that "the case against Berger was not strong . . . [he] was convicted only of conspiracy and not of any substantive offense . . . upon the [sole] testimony of . . . an accomplice with a long criminal record." *Id.* at 88–89. On these facts, the Court found that a new trial was necessary because the misconduct was so "pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Id.* at 89.

Here, Bacall contends that the prosecutor's first-time comment was a per se violation of due process. Appellant's Br. at 23 ("In this setting, and under any reasonable view of the trial record . . . this single remark . . . could not reasonably be construed as anything other than an affront to petitioner's Due Process rights."). His indignation is not unfounded. As the Michigan Court of Appeals noted, this was not "merely fair comment on the evidence." *Bacall*, at *4. Instead, "[t]he prosecutor . . . made the broader and clearly false affirmative assertion that defendant had never asserted self-defense at any time prior to trial." *Id.* The prosecutor's resurrection of the excluded concealed-carry-permit issue was also inappropriate. We disagree with the district court that this only had a slight impact on Bacall's credibility. Failing to disclose a conviction for the unlawful discharge of a firearm on a concealed-weapon-permit application could seriously damage a jury's willingness to believe the permit holder's claim of self-defense.

If this were direct review, we might find that a new trial was necessary. The Michigan Court of Appeals' decision to label the evidence against Bacall as "overwhelming" also seems inordinately generous. But unfortunately for Bacall, we are bound by the facts of cases decided by the Supreme Court—and those facts do not mandate a new trial here. *Miller* did not vacate the defendant's conviction solely on one or two isolated fibs offered by the prosecution. The lies in *Miller* were repeated and egregious, in the sense that the truth, once revealed, rendered the

prosecution's case virtually impotent. *Miller*, 386 U.S. at 3–7. In contrast, had the prosecutor refrained from improper argument here, he still had a fair case, albeit a close one. Similarly, the misconduct in *Berger* was so persistently wrong in the face of weak evidence that the need for a new trial was obvious. *Berger*, 295 U.S. at 89. But like in *Miller*, it was this persistence, not just the weakness in the government's case, that demanded a new trial. *See Donnelly*, 416 U.S. at 646 ("The 'consistent and repeated misrepresentation' of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument . . . do not reach the same proportions."). This same persistence was simply not present at Bacall's trial.

We do not mean to suggest that the prosecutor's misstatements were inconsequential or appropriate—they weren't. But we cannot say that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

## C

Finally, we address the remaining facts that Bacall raises in his defense. The trial court ordered Bacall's attorney not to object during the argument and to raise his objections afterward in a motion for a mistrial (which he did). In this motion, Bacall asked the trial court to give a curative instruction regarding the prosecutor's misstatements, but the court refused. Since the problematic statements were made in the prosecutor's rebuttal, the defense had no opportunity to correct them before the jury. The misstatements therefore went into the jury room, unconfronted and uncorrected.

Disturbing as the situation is, we cannot grant habeas relief on this basis. None of the Court's precedent addresses this precise issue, or even the broader issue of when an unresponded-to statement can unconstitutionally nudge the jury toward conviction in a close

case. And as the Court has made abundantly clear, we may not extend or interpret its precedents to award habeas relief, even when we might do so on direct review. We cannot say that the Court's precedent unambiguously forbids a conviction under these circumstances. The Michigan Court of Appeals therefore did not unreasonably affirm Bacall's conviction.

**IV**

The AEDPA standard of review can appear harsh in some cases, including this one. But we cannot rewrite the rules Congress and the Supreme Court have prescribed for us, and those rules dictate the outcome today. The judgment of the district court is **AFFIRMED**.

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring. I concur in Judge McKeague's well-crafted opinion that—in light of the present state of the law—affirms the district court's denial of Hayes Bacall's application for a writ of habeas corpus. I write separately, however, to emphasize the perversion of habeas corpus principles that has resulted from the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and the Supreme Court interpretations of that statutory scheme.

The extent to which the once-Great Writ has been subverted is underscored by Judge McKeague's recognition that the prosecutor in Bacall's state court trial knowingly and intentionally lied during closing argument in a case with questionable evidence of guilt and in which "the jury struggled deeply with the first-degree murder count." Nor was the prosecution's unethical act of minimal import. Indeed, as Judge McKeague noted, "If this were direct review, we might find that a new trial was necessary."

That we would order a cure for a constitutional violation on direct review but sit powerless to offer relief to Bacall in this collateral proceeding demonstrates just how far Congress and the judiciary have gone since 1996 to eviscerate protections once deemed by the drafters of the Constitution to be essential to "the growth of fundamental rights of personal liberty." *Fay v. Noia*, 372 U.S. 391, 401 (1963). Our Supreme Court once proclaimed that "the writ of habeas corpus is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired," *Bowen v. Johnston*, 306 U.S. 19, 26 (1939), and that a state court "cannot have the last say when it, though on fair consideration and what procedurally may be deemed fairness, may have misconceived a federal constitutional right." *Brown v. Allen*, 344 U.S. 443, 508 (1953) (opinion of Frankfurter, J.). Yet today, even in light of a clear federal

constitutional violation that might well have condemned the petitioner to life in prison, we are forced to allow the egregious error by the prosecution to go unpunished.

In *Fay*, Justice Brennan proclaimed that "government must always be accountable to the judiciary for a man's imprisonment:  if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release."  *Fay*, 372 U.S. at 402.  Sadly, after the enactment of AEDPA and the Supreme Court's interpretation of that statute, Justice Brennan's words no longer ring true.  Rather than sit silently in complicity with the congressional and judicial renunciation of the ideals upon which this country was founded, I concur in today's decision only because of our duty to rule in accordance with the Supreme Court's interpretation of the law of the land.