RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LARRY DEVEL STEWART,

*Petitioner-Appellee,*

*v.*

No. 16-2149

TONY TRIERWEILER, Warden,

*Respondent-Appellant.*

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-11843—Gerald E. Rosen, District Judge.

Argued: August 3, 2017

Decided and Filed: August 14, 2017

Before: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Andrea M. Christensen-Brown, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Edmund S. Sauer, Jessica Jernigan-Johnson, Brian R. Epling, Kimberly M. Ingram, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

SUTTON, Circuit Judge. In this habeas case, Larry Stewart claims that a Confrontation Clause violation and prosecutorial misconduct undermined the fairness of his murder trial. But

because the state court did not unreasonably reject these claims, we must reject his petition. We reverse the district court's contrary decision.

I.

On the morning of December 19, 2011, Kevin Brown arrived at an apartment to pick up Reynatta Hamilton for what he thought was a date. Unbeknownst to Brown, Hamilton's boyfriend, Larry Stewart, was waiting for him. A struggle ensued. Shots were fired. The two men grappled with each other down a stairwell and out the door of the apartment complex. At the end of a trail of blood, Brown lay dead on the grass with several gunshot wounds in his chest. Stewart was gone.

Michigan charged Stewart and Hamilton with felony murder, felon in possession of a firearm, armed robbery, and conspiracy to commit armed robbery. The court held a joint trial.

The evidence at trial showed that Stewart and Hamilton planned to rob Brown. Hamilton, who had met Brown while she was working at a McDonald's drive-through, would call Brown to her cousin's apartment for a supposed date. Stewart would wait with a gun to demand Brown's money. Witnesses testified that Stewart was with Hamilton at the apartment the night before the murder; that Stewart brandished a gun, asserted it was his, said he was "going to rob somebody," and invited others to help him that night, R. 8-8 at 35; that Hamilton warned Stewart to hide the gun from her cousin and then put it in her purse; that Stewart was going in and out of the apartment in the early morning; that Stewart left the apartment for good just five minutes before scuffling and gunshots were heard in the hallway; and that, after she'd been hit by a stray bullet, the first person Hamilton called was Stewart.

Hamilton's phone records, as well as statements she made to police, corroborated the witnesses' testimony. In the two days leading up to the shooting, Hamilton's phone made 127 different contacts with Stewart's phone and 28 contacts with Brown's. In the last minutes before the murder, Hamilton was on the phone with both men. Brown called Hamilton at 8:30 AM and hung up five minutes later. But Stewart connected to Hamilton's line at 8:31 AM. For nearly all of Brown's call, Stewart and Hamilton were connected via call waiting. Hamilton

admitted reaching out to Brown because he often had a lot of money on him. After the shooting, she repeatedly told police that "it wasn't supposed to go down like this." R. 8-11 at 23.

The jury found Stewart guilty on all counts. The court sentenced him to life for the first-degree felony murder conviction, two years for the felony-firearm conviction, and twenty-five to fifty years for the armed robbery and conspiracy convictions. The jury likewise found Hamilton guilty on all counts, and the court sentenced her to life, two years, and ten to twenty years, respectively.

Stewart challenged his convictions on direct appeal on six grounds: (1) the prosecution violated the Fifth Amendment by mentioning his post-*Miranda* silence; (2) the court violated his Sixth Amendment right to confrontation by admitting some of Hamilton's statements; (3) the convictions for conspiracy to commit armed robbery and first-degree felony murder lacked sufficient evidence; (4) the court failed to instruct the jury on a lesser included offense; (5) the prosecution engaged in various instances of misconduct; and (6) defense counsel was constitutionally ineffective. The Michigan Court of Appeals affirmed Stewart's conviction, finding some claims forfeited, others without error, and still others harmless. *See People v. Stewart*, No. 313097, 2014 WL 1233946 (Mich. Ct. App. Mar. 25, 2014) (per curiam). The Michigan Supreme Court declined to review the appeal.

Stewart filed a federal habeas petition raising the same claims. The district court granted relief on the confrontation and prosecutorial misconduct claims and did not reach the others.

II.

In habeas cases, we give the benefit of the doubt to the state courts' handling of the case. Under the Antiterrorism and Effective Death Penalty Act of 1996, we will not override state criminal convictions unless the state court unreasonably applied Supreme Court precedent or the conviction turned on unreasonable fact findings. 28 U.S.C. § 2254(d).

*Confrontation Clause.* During the joint trial of Stewart and Hamilton, Stewart claims that the state trial court violated his Sixth Amendment right to be confronted with the witnesses against him by admitting certain statements Hamilton made to police officers. The state courts

did not treat these claims casually. The trial court as an initial matter excluded some of the statements. But it eventually permitted the officers to introduce Hamilton's statements that (1) she and Stewart were dating; (2) she knew Brown and had met with him once before; (3) she saw Stewart with a gun on the night of December 18; and (4) she called Stewart and Brown moments before the shooting.

The state appellate court agreed with Stewart that some of the admitted statements violated his confrontation rights. It held that Hamilton's statements about her relationships with Stewart and Brown were testimonial hearsay in violation of the Sixth Amendment. *Stewart*, 2014 WL 1233946, at *5; *see Crawford v. Washington*, 541 U.S. 36, 51–52 (2004). And it held that her statements about Stewart's possession of a gun and her phone calls immediately before the shooting implicated Stewart in violation of the Sixth Amendment. *Stewart*, 2014 WL 1233946, at *5; *see Bruton v. United States*, 391 U.S. 123, 126 (1968). But the court concluded that both errors were harmless in view of the considerable other evidence that Stewart murdered Brown.

That conclusion receives deference under AEDPA because the state court fully adjudicated Stewart's confrontation claim. *See Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003). And we cannot say that the state court unreasonably applied federal law in rejecting it. *See Davis v. Ayala*, 135 S. Ct. 2187, 2198–99 (2015).

In assessing any potential prejudice from a Confrontation Clause violation, courts on direct review apply *Chapman*'s harmless-error standard. *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993); *see Chapman v. California*, 386 U.S. 18, 24 (1967). That standard directs courts to consider "a host of factors," including the importance of the challenged testimony, whether the testimony is cumulative, and the overall evidence of guilt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

That's what the state court did. It found that the confrontation error was not "outcome-determinative" because each of Hamilton's statements was cumulative of properly admitted evidence. *See Stewart*, 2014 WL 1233946, at *5. Justin Lane had already testified that Stewart was Hamilton's boyfriend and that he frequently came over to the apartment. Brian May

described Stewart's possession of a gun the night before the shooting and how Stewart planned to use it to rob somebody.  And the telephone records confirmed Hamilton's admission that she had contacted Brown and Stewart immediately before Brown was killed.

The state court noted that the "evidence of [Stewart's] guilt was compelling." *Id.* Combining the timing of the telephone records with eyewitness testimony about Stewart's behavior on the night before and the morning of the shooting confirms the nature of the altercation in the hallway.  The admissible evidence offers plenty of support for the jury verdict.

Stewart's conviction had at least as much evidence as the one the United States Supreme Court upheld in *Harrington v. California*, 395 U.S. 250 (1969).  The defendant in that case admitted he was at the scene of the crime and fled after a shooting, and other witnesses testified that he had a gun and was using it for a robbery.  *See id.* at 252–54.  The Court found the confrontation error harmless because the case against the defendant was "overwhelming." *Id.* at 254.  A similar conclusion applies here.

Stewart resists that conclusion, pointing to this question that the jury asked during deliberation:  "Is the report or statement[] from Ms. Hamilton evidence that the jurors can review?"  R. 8-11 at 145.  He maintains that two of our cases require us to treat this question as proof that Hamilton's statements were critical, rather than cumulative, when it came to this jury. *See Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007); *Fulcher v. Motley*, 444 F.3d 791, 810–11 (6th Cir. 2006).  Three problems undermine this argument.  One is that neither opinion constitutes clearly established law under AEDPA.  Another is that neither the trial judge nor the parties took the jury to be asking about anything other than the form in which any of the statements were made.  The judge's response to the jury's question proves the point.  "Other than what you've heard from the officers testifying [about Hamilton], no, there are no statements." R. 8-11 at 145–46.  The judge thought the jury was asking only for a written copy of Hamilton's statements to *review*.  Apparently, Stewart's counsel agreed.  He had no objection to the judge's response.  No one, besides Stewart now on appeal, thought that the jury was asking about its ability to *consider* Hamilton's statements against Stewart.

The last problem is the difficulty of using a jury query in this way, whether as proof of the difficulty of the case with respect to one conviction (Hamilton) or the other (Stewart), and whether as useful proof at all. Did this jury want to use Hamilton's statements only against Hamilton? Or did it plan to use them against Stewart? Did this jury ask because it thought the remaining evidence against Stewart was weak? Or was it confused by the judge's instructions about the use of evidence? And perhaps most importantly, if this jury had *not* asked the question, would the opposite inference apply—that Stewart is guilty and that any error was harmless? Each set of inferences turns on far too much speculation to help the inquiry rather than distract from it.

In the end, any error was cumulative of admissible evidence, and there was considerable admissible evidence of Stewart's guilt. The state court reasonably concluded that the admission of Hamilton's statements was harmless. In view of this conclusion, we need not consider the State's argument that Stewart defaulted some of these claims, as the claims fail anyway. *See* 28 U.S.C. § 2254(d).

*Prosecutorial Misconduct.* Stewart separately alleges that the prosecutor engaged in misconduct during cross-examination and closing arguments by asking Stewart to comment on witness credibility, expressing his opinion on the evidence, referring to redacted statements by Hamilton, denigrating defense counsel, and quoting from the movie *Gladiator*. To his mind, these mistakes rendered the trial unfair and denied him due process. We disagree.

At the outset, we must referee a dispute about whether AEDPA deference applies to these rulings given that the state court reviewed some of these claims for plain error. Our circuit has not been a paragon of clarity about whether a state court's plain-error ruling amounts to a ruling on the merits under AEDPA. *See Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 851 (6th Cir. 2017). In 2009, we held that AEDPA applies to a state court's plain-error analysis if it "conducts any reasoned elaboration of an issue under federal law." *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009). But in 2014, we said that "plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference." *Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014).

Both rulings cannot be right, as they look in opposite directions. *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015). To resolve this Janus-like dilemma, we look to the oldest decision on point. *See United States v. Abboud*, 438 F.3d 554, 567 (6th Cir. 2006). That is *Fleming*. If that weren't enough, our sister circuits sing with one voice on this issue—relying, in part, on *our* earlier decision. *See, e.g.*, *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1207–10 (11th Cir. 2013); *Rolan v. Coleman*, 680 F.3d 311, 319–21 (3d Cir. 2012); *Douglas v. Workman*, 560 F.3d 1156, 1177–79 (10th Cir. 2009).

Stewart tries to sidestep this conclusion on the ground that *Fleming* failed to respect earlier circuit decisions. But he misreads the decisions. They stand only for the proposition that a state court's plain-error analysis cannot resurrect an otherwise defaulted claim. *Fleming*, 556 F.3d at 530.

Confirming this conclusion is *Harrington v. Richter*. It obligates us to "presume[] that the state court adjudicated the claim on the merits" in ambiguous situations. 562 U.S. 86, 99 (2011). Despite two fleeting references to "plain error review," the state court's detailed opinion "is not even ambiguous" about its reliance on federal law to address the merits of Stewart's claims. *Frazier*, 770 F.3d at 506 (Sutton, J., concurring in part and concurring in the judgment).

The key question on the merits "is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation omitted). Because that standard is "a very general one," courts have considerable leeway in resolving such claims on a case-by-case basis. *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam). That leeway increases in assessing a state court's ruling under AEDPA. We "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable." *Trimble*, 804 F.3d at 783.

*Darden* illustrates the high bar a defendant needs to clear to win a prosecutorial misconduct claim. The prosecutor in that case asked the jury to "give [the defendant] death" because "[t]hat's the only way I know that he is not going to get out on the public." 477 U.S. at

180 n.10. After referring to the defendant as "this animal," and adding for good measure that he should be kept on a leash, the prosecutor wished for his death and disfigurement in increasingly brutal terms: "I wish I could see him sitting here with no face, blown away by a shotgun." *Id.* at 180 nn.11–12. Even though these comments "undoubtedly were improper," the Court still found "they did not deprive the petitioner of a fair trial" in view of the district court's curative jury instructions—that the lawyers' comments do not amount to evidence. *Id.* at 180–81.

Stewart does not clear *Darden*'s high bar, made higher still by AEDPA. He claims that the prosecutor crossed the line by asking him about another witness's credibility during cross-examination: "So everybody is lying except you? Bryan May is a liar, right?" R. 8-11 at 57. The state court agreed that the prosecutor misstepped but determined that the trial court's curative instructions about credibility determinations corrected the problem. No due process violation arose from this violation for another reason. The exchange arguably benefited Stewart. After the prosecutor suggested Stewart hardly knew May, Stewart promptly corrected him. "We've had a couple altercations," he said. *Id.* And "[w]e don't care for each other too much." *Id.* The question permitted Stewart to argue that a key prosecution witness had a motive to lie.

Stewart next points to some of the prosecutor's comments during closing arguments. But he does not account for these comments "in context," *United States v. Young*, 470 U.S. 1, 11–14 (1985), "to determine their effect on the trial as a whole," *Darden*, 477 U.S. at 182.

Consider Stewart's criticism of the prosecutor's final flourish during closing argument. The prosecutor recalled a line from the movie *Gladiator*: "[I]s Rome worth one good man's life? We believed it once. . . . Make us believe it again. He was a soldier of Rome. Honor him." R. 8-11 at 101–02. The prosecutor then attempted to put jurors in the shoes of the Praetorian Guards. "I don't know whether Kevin Brown was a soldier, but I know that he was an uncle, he was a brother and he was a son. He has a loving family. He was someone. I ask you to honor him." *Id.* But if this part of the trial succumbed to excessive theatrics, it wasn't the prosecutor's fault alone. Hamilton's counsel used a thespian opener of his own. After a simple, "Thank you, your Honor," defense counsel recited Lewis Carroll's *Through the Looking-Glass*: "The time has come, the walrus said, to speak of many things. Of shoes and ships and ceiling wax and cabbages and kings. And why the sea is boiling hot and whether pigs have wings." R. 8-8 at 23.

When a lawyer invokes a literary reference to aid his cause, he should not be surprised if an adversary does the same for his.

We realize that it was Hamilton's counsel, not Stewart's counsel, who started down this path. But the question is not whether the invocation of *Gladiator* was a good idea or even proper; it's whether, in context, it would deny Stewart a fair trial. *See Young*, 470 U.S. at 12. Nothing of the sort happened.

Stewart adds that the prosecutor injected his personal opinion by using the first-person singular pronoun, "I." But we agree with the state court that the prosecutor was merely "arguing reasonable inferences from the evidence." *Stewart*, 2014 WL 1233946, at *10. Here's one example. After saying "I don't really think that's how it happened," the prosecutor discussed his theory of circumstantial evidence and why the prosecution's account diverged from Stewart's. R. 8-11 at 84–85. Here's another. The prosecutor said "I think it's a complete lie" that Stewart didn't notice he had been shot in the arm for almost an hour; but the prosecutor said so only after discussing how the .357 Magnum was strong enough to hit Hamilton after "go[ing] through drywall." *Id.* at 101. Even if the use of "I" conveyed some vouching, the prosecutor did not stand alone. Stewart's counsel twice characterized the prosecution's witnesses as "stool pigeons," who might not "dare come to court." R. 8-8 at 21. Before they even testified, Stewart's counsel said "I submit to you that [their] testimony will not be credible." *Id.* The trial court could fairly discount these prosecution and defense comments as made "in the heat of argument." *Dunlop v. United States*, 165 U.S. 486, 498 (1897); *see Darden*, 477 U.S. at 182; *Young*, 470 U.S. at 17–18 (noting that the jury understood "the prosecutor was countering . . . defense counsel's argument that the evidence established no such crime").

Stewart next criticizes the prosecutor for referring to "defense tactic[s]" as "crap." R. 8-11 at 118. Inappropriate though the comment was, context mitigates it. After Stewart's counsel presented only the first half of the jury's flight instruction and suggested Stewart ran for innocent reasons, the prosecutor said this in rebuttal:

> Finally, let me read to you, *this is the kind of defense tactic crap I can't stand*. The rest of that jury instruction. . . . Let me give you the last sentence. "However, a person may also run or hide because of a consciousness of guilt."

*Id.* The gist of the comment, if not all of its language, was "invited by [and] responsive to" defense counsel's closing argument. *Darden*, 477 U.S. at 182.

The trial court's curative instructions also leavened any risk of prejudice from the prosecutor's and defense counsel's comments. Immediately after closing arguments, the judge instructed the jury that it may not let sympathy or the possible penalty influence its decision. He admonished the jury that it "is your job and nobody else's" to decide the facts. R. 8-11 at 123–24, 127–28. He reminded jurors that their duty extended to assessing the credibility of Hamilton's statements, the meaning of Stewart's flight, and the testimony of expert witnesses and police officers.

Above all else for present purposes, the judge reminded the jury that nothing the lawyers said or asked counted as evidence. Stewart's counsel reminded jurors of the same thing during his opening statement. And Hamilton's counsel repeated that point during closing. As in *Darden*, the trial court's curative instructions support the state court's conclusion that Stewart received a fair trial. *See* 477 U.S. at 182. That conclusion was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

It's worth adding that the prosecutor, despite some missteps, proactively sought the judge's guidance outside the presence of the jury. And when he was unclear on evidentiary rulings, he asked for clarification about what was permissible. Over the course of a four-day trial, he endeavored to comply with those rulings. The errors Stewart identifies were isolated comments during closing arguments. They did not "so infect" Stewart's entire trial. *Darden*, 477 U.S. at 181. In fact, the prosecutor's conduct in *Darden* was far "more inflammatory" than the prosecutor's conduct in this case. *Parker*, 567 U.S. at 47–48.

The district court's reasoning does not alter this conclusion. It relied heavily on circuit precedent in granting relief and mentioned *Darden* just once. The Supreme Court has reminded us countless times that "circuit precedent does not constitute 'clearly established Federal law'" and "therefore cannot form the basis for habeas relief under AEDPA." *Parker*, 567 U.S. at 48–49. The district court also relied on a Sixth Circuit case (*Boyle v. Million*, 201 F.3d 711 (6th Cir.

2000)) that applied a test that the Supreme Court has disowned.  As *Parker* explained, *Darden*'s "highly generalized standard" "bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit."  567 U.S. at 49.

*Additional Claims.*   Stewart adds that the prosecutor improperly referenced his post-*Miranda* silence in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976), and asks us to affirm on this alternative ground.  Because the district court declined to review this claim, as well as Stewart's other claims, "we think it the wiser course to refrain from considering those arguments for the first time on appeal."  *Pouncy v. Palmer*, 846 F.3d 144, 163 (6th Cir. 2017).

For these reasons, we reverse the district court's judgment and remand the case for further proceedings.