NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0515n.06

**No. 16-3872**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>ARIF MAJID,</td><td>)</td><td rowspan="2"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Petitioner-Appellant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>ON APPEAL FROM THE</td></tr>
<tr><td>v.</td><td>)</td><td>UNITED STATES DISTRICT</td></tr>
<tr><td></td><td>)</td><td>COURT FOR THE</td></tr>
<tr><td>JEFF NOBLE, Warden,</td><td>)</td><td>NORTHERN DISTRICT OF</td></tr>
<tr><td></td><td>)</td><td>OHIO</td></tr>
<tr><td>Respondent-Appellee.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

BEFORE: **SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** Arif Majid appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Majid was convicted in Ohio state court of murder and attempted murder. Majid's conviction depended largely on eyewitness testimony, and his distinctive religious tattoos, including the word "Jihad" stretched across his shoulder blades, played a significant role in said eyewitness identification. Majid argues that over the course of his trial, the prosecutor engaged in several instances of misconduct by improperly directing the jury to Majid's Islamic faith. He also argues that the trial court improperly admitted irrelevant and prejudicial evidence of the meaning of certain Islamic terms. The Ohio Court of Appeals rejected these arguments, and the district court concluded that the state court decision was entitled to AEDPA deference. We affirm the judgment of the district court.

I.

A.

The events in question took place at a Euclid, Ohio bar called Milton's Lounge on the evening of Saturday, September 3, 2005, and the early morning hours of Sunday, September 4, 2005. Witnesses at trial generally agreed that there was a crowd of between 40 to 60 people at the bar. Amid this crowd was a group of three to four men who were on the dance floor, taking off their shirts, and behaving in a rowdy manner. One of the men, described by witnesses as a light skinned African-American with a muscular build, had several noticeable tattoos. The tattoos included an AK-47 or assault rifle tattooed on the man's torso, the word "Jihad" tattooed across his upper back with crossed swords beneath, and additional tattoos on his arms. The shirtless man with tattoos was identified in court as Arif Majid.

Christopher Core, an acquaintance of Majid, testified that he was at Milton's Lounge with Majid[1] and LeCarlton Parker, Majid's brother, on the night in question. He confirmed that Majid was dancing with his shirt off and stated that Majid and his brother are easily distinguishable. While Majid has tattoos, light brown skin, and a muscular build, Parker is shorter with darker skin and a less muscular frame. Core also testified that of the men in the group, Core was the only one who wore his hair in braids.

The group soon attracted the attention of the bar's management, including Milton P. Franklin Jr., the owner of Milton's Lounge, who went to speak to the DJ about enforcing the bar's shirts-on policy. The group put their shirts back on, but the man with the distinctive tattoos soon took his off again. After one of the men dropped a drink, Franklin Jr. spoke with bar employees about getting the group to leave Milton's Lounge. One of the employees was his son, Milton P.

---

[1] Core knew Majid by his given name, Cedric Parker, and thus referred to Majid during his testimony as "Cedric."

Franklin III, who was working at Milton's Lounge as a bartender. Franklin III asked the group to leave, and they were escorted out of the bar.

Instead of leaving the premises, though, the group continued to loiter in front of the bar. The man with tattoos was still with the group and had his shirt off again. Franklin Jr. told the men that loitering was not permitted, but they ignored him. Then, one of the bar's other employees came outside and reiterated that the men needed to leave; they ignored him as well. At that point, Franklin III noticed the situation and joined the group outside. He also asked the group to move along and testified that one of the members "got in [his] face" and said "threatening" things. DE 8-9, Trial Tr. Vol. 7, Page ID 2479. Franklin Jr. saw that the situation was deteriorating and told his son to go back inside the bar.

Franklin Jr., Franklin III, and the other bar employees went inside the bar, and Franklin Jr. closed the front door and searched through his key chain for the key to lock the door. As his father searched for the key, Franklin III retrieved his gun from the back of the bar. At that moment, someone punched the window in the front door and cracked it.[2] Although Franklin Jr. tried to hold his son back, Franklin III opened the front door, where he saw Majid and another man, and fired two shots. Franklin III was then pulled back inside the bar, and Franklin Jr. quickly locked the door. At that point, the front door window broke completely, and the glass fell onto the floor. Core, who was in the parking lot with Parker and Majid, heard Majid say, "Somebody tried to shoot my brother." DE 8-8, Trial Tr. Vol. 6, Page ID 2287–88.

An arm holding a gun then came through the front-door window to the inside of the bar; witnesses testified that the arm was tattooed and appeared to be that of a light-skinned African-

---

[2] Blood was later found on the window, with DNA belonging to LeCarlton Parker. A witness testified that the man who punched the front door was a "dark-skinned gentleman," not the lighter-skinned man with tattoos. DE 8-10, Trial Tr. Vol. 8, Page ID 2620.

American man. The gun was fired through the window into the bar. One of the bouncers attempted to grab the arm, but the shooter was able to twist free. The shooter then withdrew his arm from the front-door window.

A few seconds later, more gunshots were fired through the larger, main window of the bar (the "picture window"). Rayshawn Whitsett, one of the victims injured by the shooting, testified that he was standing up to leave the bar after the first set of gunshots and could see clearly out of the picture window. He stated that he saw "[a] light-skinned cocky fellow" of indeterminate height wearing a "wife beater" with tattoos on his arm. DE 8-6, Trial Tr. Vol. 4, Page ID 1647. Whitsett recognized the shooter as "[t]he guy with the Jihad on his back," and identified Majid in court as the shooter. *Id.* at 1647, 1676–77. Another witness, Michelle Johnson, had been a customer at the bar when the incident occurred. She looked out the picture window and "clearly" recognized the man who had been dancing shirtless earlier in the night. DE 8-8, Trial Tr. Vol. 6, Page ID 2152. She too saw his face and identified Majid in court as the shooter. Johnson's friend, Nickeesha Robinson, also saw the shooter through the picture window and identified him in court as Majid. She recognized him from the dance floor. Finally, Franklin III testified that he saw the shooter come to the picture window, duck behind the brick wall next to the window, and shoot through the window six times. Franklin stated that he clearly saw the shooter's face and identified him in court as Majid.

Three bar patrons were struck by bullets during the shooting, and one victim, Jerome Thomas, died as a result of his wounds. *See State v. Majid,* No. 96855, 2012 WL 986127, at *3 (Ohio Ct. App. Mar. 22, 2012). One of the initial officers on the scene was able to obtain a "very vague description" of the shooter on the night of the incident from several witnesses, who described him as "a light-skinned black male." DE 8-10, Trial Tr. Vol. 8, Page ID 2581–82.

Another officer obtained a description of the suspect as a "[l]ight-skinned black male with, possibly with braids and with tattoos." *Id.* at 2670. The specific description recorded on the suspect sheet was: "Five-six to five-eight, medium, light-skinned, unknown eyes, black male, Jihad on back, and other unknown tattoos. Possibly 25 to 35. Possible goatee, braids, brown hair, blue jeans." *Id.* at 2681. Franklin III gave a very short statement the night of the shooting: "Guy with Jihad tattooed on his back busted out window and then him and four other guys started shooting in the window." DE 8-9, Trial Tr. Vol. 7, Page ID 2497. He later admitted that there were not multiple shooters and that he had been trying to keep his statement as brief as possible before he was arrested for his role in the shooting. Franklin III subsequently made more detailed statements to the police, describing the Jihad tattoo with the two swords beneath it.

Franklin Jr. was contacted by the police the day after the shooting and agreed to make a written statement. In his statement he described the tattooed individual and mentioned that one of the tattoos was the word "Jihad." Whitsett also made a written statement to the police and sketched out the placement of the shooter's tattoos; he drew a man's back with "Jihad" across the shoulders and a cross underneath the word. Similarly, Johnson provided a written statement seven months later where she described the shooter and provided a rough drawing of his tattoos and their locations. Several witnesses also identified Majid out of a photo lineup.

B.

Majid was charged with one count of aggravated murder carrying two firearm specifications, three mass murder specifications, one repeat violent offender specification, and a notice of prior conviction; one count of having a weapon while under disability; and three counts of attempted murder carrying two firearm specifications, one repeat violent offender specification, and a notice of prior conviction. *Majid*, 2012 WL 986127, at *1. He pled not guilty and was tried

by a jury on all counts save for the Count 2 weapons under a disability charge, for which he waived his right to a jury trial. He was convicted by the jury of murder and two counts of attempted murder with the attendant specifications, and the court found him guilty of having a weapon under disability. *Id.* He appealed his convictions, and the Ohio Court of Appeals reversed because a juror had been sleeping through portions of the trial. *State v. Majid*, 914 N.E.2d 1113, 1114 (Ohio Ct. App. 2009).

### C.

Majid was retried, with the second trial beginning on April 25, 2011. *Majid*, 2012 WL 986127, at *1. Before retrial, the state of Ohio dismissed several specifications from the indictment, and Majid once again waived his right to a jury trial for the weapon under disability count. *Id.* The issues in this appeal concern the prosecutor's conduct in parts of the second trial and the trial court's admission of certain evidence in that trial. Specifically, the prosecutor made comments and engaged in lines of questioning that drew attention to Majid's Islamic faith and to his "Jihad" tattoo. The prosecutor first asked about the significance of the term "Jihad" when questioning Whitsett about Majid's tattoos:

> Q: What do you remember about what was on his back?
> A: Across the top part it said Jihad, and above was a cross.
> Q: Being in the military, did Jihad have significance to you?
> [Defense counsel]: Objection
> The court: Approach the bench, bring the record.
> The court [sidebar with counsel]: State your objection, please.
> [Defense counsel]: The question of whether a man in the United States military that the word Jihad has any significance has no relevance with respect to the matter before this Court. It's simply to inflame the jury with respect to the fact that it means holy war and that has nothing to do with any religious beliefs here. And this witness is not competent to comment on whether or not what that significance of a tattoo means on a person's back.
> The court: Mr. Thomas
> Mr. Thomas [prosecution]: I believe it's relevant.

> The court: Well, I believe the only thing relevant is whether or not he remembers that tattoo and why he remembers that tattoo not any editorializing on your behalf. But it would be relevant as to the test of memory as to why a person remembers any fact, be it a tattoo or any other fact. But you should not lead the witness, nor editorialize on what you think is the basis of his memory on any point.

DE 8-6, Trial Tr. Vol. 4, Page ID 1638–40. After the court's instructions, the prosecution did not ask Whitsett about the significance of "Jihad" again, and the witness never answered the question whether the term was meaningful to him. The prosecutor's next question was, "You saw Jihad where on the person's body?" *Id.* at 1640. Whitsett then described the location of the tattoos in more detail.

The prosecutor engaged in a much more in-depth line of questioning about Islam during the direct examination of Franklin III, who was a practicing Muslim at the time of trial and at the time of the shooting. The prosecutor first asked Franklin III about his appearance:

> Q: Sir, as you appear before us today you're wearing something on your head; is that correct?
> A: Yes.
> Q: What is that item?
> A: It's a Kufi.
> Q: Does it have religious significance to you?
> A: Yes.
> Q: Why?
> A: I'm a Muslim.
> Q: And you're wearing a beard, correct?
> A: Yes.
> Q: Is that for religious reasons also?
> A: Yes, it is.

DE 8-9, Trial Tr. Vol. 7, Page ID 2449. A bit later into his direct examination, the prosecutor asked Franklin III more detailed questions about Islam:

> Q: Do you have any words [tattooed on your body] that would reference your religion such as Islam or Islamic Nation or anything of that nature?
> A: No.
> Q: Do you have anything on your body like, Military Mind?

A: No.

Q: There is an Arabic greeting, and I don't know, maybe you can place it in context for me because I don't pretend to be knowledgeable about it, I just know of it. It begins with, I believe, Salam and another word?

A: Assalamu Alaikum.

Q: Can you slow that down and sound it out please?

A: Assalam U Alaikum.

Q: What does that mean?

A: Peace be onto you.

Q: Can you spell that for us, please?

A: A-S-S-L-A-A-M, U, A-L-A-I-K-U-M.

Q: And for practitioners of Islam, how is it used?

A: As a greeting to other Muslims.

Q: Peace be unto you?

A: Yes.

Q: Are you familiar with the term Mujahid?

A: Yes.

Q: What does it mean to you?

[Defense counsel]: Objection.

The court: Overruled. He may answer.

A: One who is struggling with things in the world. It could be your addiction to, you know, things that you know are outside of Islam. And it can also be interpreted as a soldier, but that's really an incorrect definition.

Q: Are you familiar with the term Jihad, J-I-H-A-D?

A: Yes.

[Defense counsel]: Objection.

The court: Overruled.

Q: What does it mean to you?

A: Jihad is actually like the root word of Mujahid which means struggle to which you are trying to overcome. It could be strife in your nation, it could be, like I said, your addiction of doing things that you know are contrary to your beliefs of Islam. But it's also a lot of times misconstrued to mean war.

[Defense counsel]: Objection.

The court: Sustained.

Q: Do you have the word "Jihad" on your body?

A: No.

Q: Do you have the word "Mujahid" on your body?

A: No.

Q: I'm referencing when I say on your body, I mean tattoos?

A: No, I don't.

Q: You don't have any swords on your body, sir?

A: No.

*Id.* at 2458–60.  Finally, when Franklin III was describing Majid dancing shirtless at Milton's, the prosecutor asked:

> Q: The tattoos that you saw, did they have any meaning for you?
> A: Yes.
> Q: In what way?
> A: They were Islamic terms, Arabic terms.
> Q: Is there anything about that, given what we have already discussed, your religious orientation, does that have any role here in what we're going to cover?
> A: No.
> Q: So, although you're seeing these religiously themed tattoos, we can agree there is no sort of religious undertone to this problem?
> A: No.

*Id.* at 2467.

There was no further discussion of Islam until closing arguments.  During his closing argument, Majid's defense attorney argued that witnesses and law enforcement had zeroed in on Majid not because he was guilty, but because "he had odd Islamic tattoos."  DE 8-11, Trial Tr. Vol. 9, Page ID 2809.  Defense counsel repeatedly emphasized this theme throughout his closing, calling Majid's tattoos "the very pivotal point" and making comments such as, "We're shortly past the 9-11 period in 2005, and yet we have to focus on that part of the case," *id.* at 2809, and "the Nation of Islam, all of those people who are Islamic in this country are bad people.  That's how we have to focus on the guy with the Jihad tattoo," *id.* at 2813–14.  In fact, the defense attorney repeated the phrase "guy with the Jihad tattoos" several times to stress his theory that Majid was identified and charged because of his "different body art that was offensive to the sensibility of decent Americans." *Id.* at 2809–10.

In rebuttal, the prosecutor seemed to address the defense attorney's accusations about anti-Islamic bias by first speculating about the reason why someone would choose such unusual tattoos:

What do you think it takes, from your life experiences, to place this body art on yourself as a person; what statement are you trying to make? Stop and ask yourself that question. Mujahid, a rifle, swords, Jihad. Is that a statement of self expression of don't mess with me. I'm a warrior, I'm dangerous. I'm something you don't want to mess with. I think the average person would agree with those statements.

*Id.* at 2832–33. The prosecutor then clarified that the tattoos were relevant because they were unusual and stood out to witnesses, enabling them to remember Majid's face and identify him as the shooter:

There is nothing that identifies him before you as some sort of Islamic warrior other than the photos that you've seen in evidence, but they are not offered for that purpose. . . . [T]his is unique trait identification. This is not religious prejudice. This is about who did what, and who fired the shots.

*Id.* at 2833. The prosecutor later implied that Majid was not even a true adherent of the Muslim faith because "he didn't care about the rest of the occupants in the bar, innocent women, it didn't matter to him. If he's this Islamic warrior, if he's got some sort of honor, he should have called Milton Franklin, III out and said, business outside." *Id.* at 2840. The prosecutor concluded his rebuttal by emphasizing the numerous eyewitness identifications of Majid, stressing that "the consistent point is light-skinned black male with tattoos is the shooter." *Id.* at 2844.

The jury found Majid guilty of murder and two counts of attempted murder, along with the charged firearm specifications. The court found him guilty of having a weapon while under disability. He was sentenced to fifteen years to life on the murder count with three years added for the firearm specification, to be served consecutively, ten years on each of the attempted murder counts, and five years for having a weapon while under disability. All sentences were to run consecutively.

D.

On April 15, 2013, Majid filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising thirteen grounds of error. The magistrate judge recommended that the

district court dismiss the petition, and the district court agreed, adopting the Report and Recommendation over Majid's objections.

The district court granted a certificate of appealability on Majid's claim that the prosecutor engaged in misconduct by (1) questioning Whitsett about the meaning of certain Islamic terms, (2) examining Franklin III about his religion and asking him to define certain Islamic terms, and (3) suggesting to the jury during closing that Majid was an "Islamic warrior" whose tattoos were evidence of guilt. This court expanded the certificate of appealability to include the issue "whether the trial court denied Majid a fair trial by admitting Franklin [III]'s testimony about the meanings of certain Islamic terms," DE 41, Order, Page ID 3492, and appointed counsel for Majid.

II.

This court "review[s] the district court's legal conclusions in a habeas proceeding de novo and its factual findings under the clear-error standard." *Davis v. Lafler*, 658 F.3d 525, 530 (6th Cir. 2011) (citing *Awkal v. Mitchell*, 613 F.3d 629, 638 (6th Cir. 2010) (en banc)). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may not grant a state prisoner habeas relief unless the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

III.

A.

Majid argues that the prosecutor's questions and comments about Islam violated his right to due process and rendered his conviction "fundamentally unfair." Before this court are three instances of potentially improper conduct: (1) the prosecutor's questioning of Whitsett about Islamic terms, (2) the prosecutor's questioning of Franklin III about Islamic terms, and (3) the prosecutor's comments about Islam during closing arguments.[3]

On habeas review of alleged prosecutorial misconduct, we must evaluate the totality of the circumstances surrounding each trial to determine if the challenged conduct rendered the trial fundamentally unfair. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) and *Hayton v. Egeler*, 555 F.2d 599, 604 (6th Cir. 1977)). Due process is the touchstone here: "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). Instead, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *DeChristoforo*, 416 U.S. at 643). This standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (alteration in original) (quoting *Alvarado*, 541 U.S. at 664). "That leeway increases in assessing a state court's ruling under

---

[3] In his brief, Majid seems to challenge a question that the prosecutor asked during voir dire as well. Specifically, the prosecutor, while trying to illustrate that individuals tend to remember traumatic events more clearly, asked the jurors whether they remembered where they were on September 11, 2001. Majid argues that because of this question "the juror's recollections of 9/11 hung over the start of proceedings." CA6 R. 25, Appellant Br., at 17. But Majid has procedurally defaulted this claim since he raises it for the first time before this court. *See Coles v. Smith*, 577 F. App'x 502, 511 (6th Cir. 2014). Moreover, Majid's certificate of appealability does not include consideration of prosecutorial statements made during voir dire.

AEDPA," as this court "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable." *Stewart v. Trierweiler*, 867 F.3d 633, 638–39 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1998 (2018) (alteration in original) (quoting *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015)).[4]

A prosecutorial misconduct claim "is evaluated in light of the record as a whole." *United States v. Dakota*, 197 F.3d 821, 828 (6th Cir. 1999). "To warrant a new trial, . . . prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Causey*, 834 F.2d 1277, 1284 (6th Cir. 1987) (internal quotation marks and citation omitted).

B.

The word "Jihad" carries strong negative connotations in the United States and had the potential to be highly inflammatory at Majid's trial. Here, Majid's "Jihad" tattoo was crucial to eyewitnesses' identification of him, and therefore it became a necessary part of the trial. Having reviewed the lengthy trial transcript, we conclude that Majid was not denied due process by the prosecutor's references to Islam. While some of the prosecutor's challenged questioning and comments were improper, Majid has not shown that they so infected the trial with unfairness as to make the resulting conviction a denial of due process.

---

[4] The district court order and both parties apply a test previously employed by this circuit that asks whether the challenged conduct was "improper" and "flagrant," with a four-factor analysis used to determine flagrancy. *See, e.g.*, *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005). However, this test was expressly rejected by the Supreme Court in *Parker v. Matthews*, 567 U.S. 37 (2012). *Id.* at 48 (calling it an "elaborate, multistep test employed by the Sixth Circuit" that "bears scant resemblance" to *Darden*); *see also Ross v. Pineda*, 549 F. App'x 444, 449 (6th Cir. 2013) ("[Petitioner] cannot rely on the two-part test for prosecutorial misconduct articulated by this Court . . . which asks if the prosecutor's conduct is improper and flagrant. *See Parker*, 132 S. Ct. at 2155 (rejecting the use of this test).").

1.

The first instance of challenged conduct is the question the prosecutor asked Whitsett about the significance of the word Jihad: "Being in the military, did Jihad have significance to you?"[5] In his appeal to the Ohio Court of Appeals, Majid argued that this question violated his right to due process, but the Ohio Court of Appeals did not specifically address whether the questioning of Whitsett constituted prosecutorial misconduct. It addressed all other specific instances of misconduct alleged in Majid's petition, and Majid's challenge to the questioning of Whitsett comprised of one sentence out of forty total pages. It is therefore likely that the state court "inadvertently overlooked" this claim, so we review it *de novo* instead of giving the state court decision AEDPA deference. *See Johnson v. Williams*, 568 U.S. 289, 303 (2013) ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."); *see also Brown v. Romanowski*, 845 F.3d 703, 711 (6th Cir. 2017). Even under the *de novo* standard of review, the prosecutor's question to Whitsett did not violate Majid's constitutional rights.

We agree with the district court that this question was likely improper because it "directed the jury to focus, not on whether the nature of Majid's tattoo made it more likely that Whitsett was testifying accurately, but on what 'Jihad' signified to Whitsett in his capacity as an American

---

[5] In his brief to the Ohio Supreme Court, Majid did not specifically discuss the questioning of Whitsett as an instance of prosecutorial misconduct. The district court noted that the claim would therefore be "subject to a clear procedural default," except the Warden failed to invoke the default in his answer. DE 36, Order, Page ID 3400. The district court therefore concluded that the Warden forfeited the defense. In his brief, the Warden asks that this court *sua sponte* dismiss the argument as procedurally defaulted. He argues that the failure to raise the defense was "an inadvertent error." CA6 R. 32, Appellee Br., at 35. "[F]ederal appellate courts have discretion, in 'exceptional cases,' to consider a nonexhaustion argument 'inadverten[tly]' overlooked by the State in the District Court." *Wood v. Milyard*, 566 U.S. 463, 471 (2012) (second alteration in original) (quoting *Granberry v. Greer*, 481 U.S. 129, 132, 134 (1987)). However, the Warden has not given any reason to believe that this case involves exceptional circumstances, so we deem the defense forfeited.

service member." DE 36, Order, Page ID 3403. However, although the question was improper, it did not rise to the level of a due process violation. Its impact was mitigated by defense counsel's objection and the trial court's subsequent instruction to the prosecution not to "editorialize." Indeed, Whitsett never actually answered the prosecutor's question about the term's significance to him, and the prosecutor did not ask the question again. Instead, he moved on to the specific location of the tattoo, asking, "You saw Jihad where on the person's body?" DE 8-6, Trial Tr. Vol. 4, Page ID 1640. The remarks were also isolated, even considered in conjunction with the other instances of challenged prosecutorial conduct. Majid's trial lasted for six days, and the transcript spans over 1,500 pages. The questioning of Whitsett about the meaning of "Jihad" lasted for half of a page, and all the challenged remarks combined take up no more than fifteen pages— one percent of Majid's trial. Finally, the other evidence against Majid was strong. Four eyewitnesses stated that they could see Majid clearly through the picture window, recognized him from the dance floor, and saw him shoot into the bar. We therefore affirm the district court's judgment on this claim.

2.

Next, Majid argues that the prosecutor engaged in misconduct by questioning Franklin III about certain aspects of Islam; namely, Franklin III's Kufi and beard, the meaning of "Assalamu Alaikum," the meaning of "mujahid," and the meaning of "jihad." The Ohio Court of Appeals concluded that although the prosecutor's questions were "of minimal relevance and straddling the line of impropriety," the questions and answers from Franklin III did not deprive Majid of a fair trial. *Majid*, 2012 WL 986127, at *8. Since the state court fully adjudicated Majid's challenge to the questioning of Franklin III, AEDPA deference applies. We hold that the state court was reasonable in its determination that these questions did not deprive Majid of a fair trial, since there is room for fairminded jurists to disagree on this issue. *Richter*, 562 U.S. at 101.

Doubtless the questions were misleading, deliberate, and elicited irrelevant information. The meaning of "Assalamu Alaikum" and "mujahid" had no bearing whatsoever on this case, and the association between "jihad" and "war" was inflammatory and irrelevant. Furthermore, the prosecutor's question to Whitsett also linked "jihad" with violence, so this was the second time that the prosecutor made such a connection to the jury. Perhaps Franklin III's own adherence to Islam is tangentially relevant, as it goes to his familiarity with Islamic terms and therefore his recognition of Majid's tattoos; but even this is a stretch. Unfortunately, the trial court overruled every objection defense counsel made to the questions, only sustaining an objection after Franklin III had provided a lengthy explanation of the meaning of "jihad" as he understood it.

Nonetheless, Majid has not shown that "the state court's determination . . . was unreasonable." *Stewart*, 867 F.3d at 639 (quoting *Trimble*, 804 F.3d at 783). As stated above, the trial transcript here numbered over 1,500 pages, and the pages with potentially improper questions or remarks number less than one percent of the total transcript. And four separate eyewitnesses testified that Majid was the shooter. Moreover, the prosecutor mitigated his questioning somewhat by eliciting Franklin III's confirmation that "although you're seeing these religiously themed tattoos, we can agree there is no sort of religious undertone" to the shooting. DE 8-9, Trial Tr. Vol. 7, Page ID 2467. We cannot say that the state court's decision was unreasonable or contrary to clearly established federal law. *See Stewart*, 867 F.3d at 638–39; 28 U.S.C. § 2254(d). We therefore affirm the district court on this claim.

3.

Finally, Majid argues that the prosecutor's comments during his rebuttal closing arguments denied him due process and were calculated to prejudice the jury against the defendant. The state court acknowledged that some of the prosecutor's comments during rebuttal closing arguments were improper but found no constitutional violation had occurred because "such comments did not

pervade the entire trial, let alone the closing argument." *Majid*, 2012 WL 986127, at *10. Viewed alongside the prosecutor's questioning of Whitsett and Franklin, the impropriety of the comments made during rebuttal is a close call, but fairminded jurists could disagree about the outcome. *See Richter*, 562 U.S. at 101. Thus, the state court's conclusion is entitled to deference under AEDPA.

At the outset, we note that Majid's defense opened the door to some of the prosecutor's comments in rebuttal by repeatedly saying that law enforcement targeted Majid because he was the "guy with the Jihad tattoo," and the investigators and witnesses harbored anti-Islamic bias. "The prosecution necessarily has wide latitude during closing argument to respond to the defense's strategies, evidence and arguments." *Wogenstahl v. Mitchell*, 668 F.3d 307, 329 (6th Cir. 2012) (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (internal quotation marks omitted)); *see also Clarke v. Warren*, 556 F. App'x 396, 408 (6th Cir. 2014).

However, not all of the prosecutor's comments can be justified as responses to the defense strategy. His use of the phrase "Islamic warrior," DE 8-11, Trial Tr. Vol. 9, Page ID 2833, and his speculation that "the average person would agree" that Majid's body art signified an intention to show that he was "dangerous" and a "warrior," *id.* at 2832–33, were prejudicial and did nothing to rebut the defense's accusations that Majid was unfairly targeted because of his religion. We agree with the state court that these arguments were improper. *See Majid*, 2012 WL 986127, at *10. But the state court did not unreasonably conclude that the prosecutor's rebuttal did not rise to the level of a due process violation. While the comments were both deliberate and prejudicial, they were relatively isolated, and abundant eyewitness testimony supported Majid's conviction. *Cf. Slagle v. Bagley*, 457 F.3d 501, 523 (6th Cir. 2006) (concluding that a total of "fifteen improper comments taken together did not render [the plaintiff's] trial unfair"). The prosecutor also made other comments in rebuttal that tended to mitigate the inflammatory nature of his "Islamic warrior"

remarks; for instance, he stated that "this is unique trait identification. This is not religious prejudice. This is about who did what, and who fired the shots." DE 8-11, Trial Tr. Vol. 9, Page ID 2833. Because Majid has not shown that the state court's decision was unreasonable or contrary to clearly established federal law, we affirm the district court's denial of this claim.

## IV.

In his petition, Majid argued that the trial court denied him a fair trial by allowing the prosecutor to elicit testimony from Franklin III about the meaning of certain Islamic terms. By admitting the meanings of these terms into evidence, Majid claimed, the trial court admitted irrelevant evidence that served only to inflame the jury's passions. The Ohio Court of Appeals held that the trial court did not abuse its discretion in admitting the testimony because Franklin III's understanding of Islamic terms "was relevant to establish why the witness[] remembered appellant and his distinctive tattoos." *Majid*, 2012 WL 986127, at *10. While the state court's conclusion about relevance is shaky at best, admission of the testimony did not rise to the level of a constitutional violation.

## A.

"[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983) (citing *Bell v. Arn*, 536 F.2d 123 (6th Cir. 1976) and *Reese v. Cardwell*, 410 F.2d 1125 (6th Cir. 1969)); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Instead, "[f]ederal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001) (citing *Patterson v. New York*, 432 U.S. 197, 202 (1977)). "State court evidentiary rulings do not rise to the level of due process violations unless they 'offend . . . some principle of justice so rooted in the traditions and conscience of our

people as to be ranked as fundamental.'" *Id.* (alteration in original) (quoting *Patterson*, 432 U.S. at 202).

B.

This court almost never grants habeas relief based on state court evidentiary decisions, and this is not the exceptional case where the court's decision was so unfair as to amount to a due process violation. As the state court noted, Franklin III's understanding of the term "jihad" was tangentially relevant, since his familiarity with the word made it more likely that he would remember it. *Majid*, 2012 WL 986127, at *10. Admission of the remaining proof about Franklin's understanding was minimally damaging. In *Walker*, where we did find that evidentiary errors violated the petitioner's due process rights, there were numerous pieces of irrelevant and damaging evidence admitted at trial, including insinuations that defense witnesses were being improperly coached, improper speculations, and prejudicial newspaper clippings. 703 F.2d at 962–68. There, we concluded that "the *cumulative* effect of the conduct of the state was to arouse prejudice against the defendant to such an extent that he was denied fundamental fairness." *Id.* at 968 (emphasis added). Here, Majid only challenges on due process grounds the admission of the meaning of certain Islamic terms, and the evidence was presented to the jury over two pages of the 1,500-plus page trial transcript. Since at least some of the evidence had some relevance to Franklin III's identification of Majid, and the evidence played a minimal role in the state's case, its admission did not violate due process. We therefore affirm the district court's denial of this claim.

V.

Even assuming that there was constitutional error, Majid is not entitled to habeas relief unless he can show that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial or injurious effect or influence" means "actual

prejudice." *See id.* at 637–38; *see also, e.g.*, *Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Gover v. Perry*, 698 F.3d 295, 299 (6th Cir. 2012). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (emphasis removed) (quoting *Kotteakos*, 328 U.S. at 764–65). We do not think that Majid meets *Brecht*'s "substantial and injurious effect" requirement.

If there was error in Majid's trial, it was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *United States v. Thomas*, 728 F.2d 313, 320 (6th Cir. 1984)). Even assuming that all of the challenged questions and remarks were constitutionally erroneous, they played a miniscule role in Majid's entire trial. Moreover, although discussion of "Jihad" had the potential to inflame the jury, Majid's "Jihad" tattoo was central to his identification by multiple witnesses and therefore necessitated at least some discussion. Additionally, during closing arguments, Majid's attorney repeatedly stressed the theory that Majid was unfairly targeted because of anti-Muslim bias, meaning the jurors were made aware of the potential for anti-Muslim bias to infect their verdict. While awareness of bias does not, of course, eliminate it, we think that the defense succeeded in putting the jury "on notice" that convicting Majid based on any perceived offensiveness of his tattoos or his religious beliefs was improper. Finally, while a bare sufficiency of the evidence inquiry is not appropriate in actual prejudice analysis, this court does consider the strength of the case against the defendant in determining whether the *Brecht* standard is met. *See Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008) (finding harmless error in part because "the case against the Petitioner was strong"); *Pritchett*, 117 F.3d at 964–65 (finding harmless error

where, among other considerations, "the competent proof of Petitioner's guilt was abundant").

Here, there was strong evidence against Majid and consequently, we conclude that any error was

harmless.[6]

VI.

For the foregoing reasons, we affirm the judgment of the district court.

---

[6] Majid argues that the court should consider the prosecutor's comments in light of President Obama's announcement of Osama bin Laden's death the night before closing arguments. The prosecutor did not mention Osama bin Laden or bring news of his death into the trial in any way. Any role that the news of bin Laden's death played in the jury's deliberations would be pure speculation. Also, Majid raises this argument for the first time on appeal. We therefore do not consider it here.