**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0555n.06

No. 17-1012

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ANTHONY D. PHILLIPS,

      Petitioner-Appellant,

v.

BONITA HOFFNER, Warden,

      Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

**FILED**
Nov 05, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

---

**BEFORE:** MOORE, KETHLEDGE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Anthony D. Phillips appeals the decision of the United States District Court for the Eastern District of Michigan denying his petition for relief under 28 U.S.C. § 2254. On appeal, Phillips requests that his jury conviction be set aside because: (1) the trial court's limitations on his cross-examination of several witnesses deprived him of the right to present a defense; (2) a police officer who testified for the prosecution violated the Confrontation Clause by relying on a report authored by someone else; (3) the prosecutor engaged in misconduct by eliciting false testimony; and (4) he was denied effective assistance of counsel. Although we find the conduct of both Phillips's trial counsel and the prosecutor troubling, we are nevertheless constrained by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

## I.    BACKGROUND

### A.    Factual Background

Lacey Tarver's dead body was discovered in his Detroit home by his brother on March 4, 1987. *People v. Phillips*, No. 300533, 2013 WL 2223388 at *1 (Mich. Ct. App. May 21, 2013) (per curiam). Tarver's house was in disarray—the lights were on, and it appeared to have been "ransacked." *Id.* Tarver's brother found Tarver fully clothed, leaning against a bedroom wall and surrounded by blood. *Id.* The house's rear basement window was shattered, and several items were missing, including a computer, television, VCR, cassette player, wallet, car keys, and stereo system. *Id.* There was blood around the broken window, indicating that an intruder had entered the house there and had been cut by the broken glass in the process. *Id.*

Tarver had previously dated Phillips's sister, Carmen Allen. *Id.* Allen and Tarver had lived together in the house where Tarver was murdered, but Allen moved out when the two broke up around Thanksgiving 1986. *Id.* In addition to Allen, Phillips has another sibling, a brother named Bobby. *Id.* Allen testified at trial that her mother and Phillips had been frequent visitors when she lived with Tarver, but Bobby had been unwelcome after a prior break-in. *Id.* Allen did not know of any conflict between Tarver and Phillips, and Phillips had helped the couple with household repairs. *Id.* Allen also sent Phillips to Tarver's house on at least two occasions after the 1986 breakup, including sending Phillips to pick up a stove hood from Tarver's house the week Tarver was murdered. *Id.*

Dr. Marilee Frasier conducted an autopsy on Tarver the day his body was found in 1987. *Id.* at *2. Dr. Frasier passed away before Petitioner's trial in 2013, so Deputy Chief Medical Examiner Cheryl Loewe used Dr. Frasier's records to testify at trial. *Id.* She testified that Tarver appeared to have died from blows to the head and that the marks were consistent with wounds from both the head and claw ends of a hammer. *Id.*

Detroit Police Department (DPD) Officer Carl Kimber served as an evidence technician and, in March 1987, he collected evidence, fingerprints, and blood samples from Tarver's house. *Id.* DPD forensic serologist Paula Lytle tested the blood on the items Kimber collected, including a tissue found on the kitchen table, a checkbook found in a bedroom drawer, and a shard of glass from the basement window. *Id.* Lytle also tested blood samples from Phillips and Tarver. *Id.* According to Lytle, both Phillips and Tarver had Type O blood, and the tissue and checkbook each tested positive for Type O blood. *Id.* The trial testimony about the shard of glass indicates that Lytle could not conclusively determine what type of blood was on it.[1] *Id.*

DPD's Latent Fingerprint Unit analyzed nine fingerprints that Kimber collected during the 1987 investigation. *Id.* Marcia McCleary, a latent fingerprint expert, testified at trial about the print comparisons run by other DPD employees back in 1987. *Id.* She stated that three of the nine prints were unusable and that five prints did not match Phillips. *Id.* The ninth print, however, aligned with 14 different identification points on Petitioner's left thumb and thus was a match. *Id.* This print came from a Band-Aid box in one of Tarver's bathrooms, where investigators also found peeled strips from a Band-Aid on the floor. *Id.* at *1, *3. Although an April 1987 memo from one of the investigating officers, David Kramer, indicated that Phillips was a suspect in Tarver's murder, Kramer mentioned that the prosecutor had determined that there was insufficient evidence to arrest him.[2]

In 2008 or 2009, the DPD sent the evidence collected from Tarver's house for additional testing. Like Lytle, Michigan State Police forensic scientist Jennifer Summers confirmed the presence of human blood on the tissue, checkbook, and shard of glass. *Id.* at *2. Summers

---

[1] This testing occurred in 1987, when DNA technology was not yet available.

[2] Officer Kramer was a homicide officer and was apparently involved with the search at Petitioner's residence in March 1987. He passed away before trial. We refer to his April 16 memorandum as the Kramer Memo.

determined that the blood on the glass was too faint to submit for further testing. *Id.* Catherine Maggert, a DNA expert with a Northville, Michigan crime laboratory, conducted DNA testing on the tissue and checkbook. *Id.* at *3. Both tested positive for a genetic marker indicating that the blood belonged to a male. *Id.* The tissue carried reportable data for 12 of the 13 loci (i.e., markers) from which Summers built DNA profiles, and the checkbook had reportable data for 3 of the 13 loci. *Id.* The three reportable DNA loci from the checkbook matched the corresponding loci of the DNA collected from the tissue. *Id.*

Another forensic scientist at the Northville crime lab, Andrea Halvorson, then compared the DNA profiles from the tissue and checkbook against Petitioner's DNA.[3] *Id.* The 12 reportable loci from the tissue matched the corresponding 12 loci in Petitioner's DNA profile. *Id.* The probability of selecting a random, unrelated, African-American male with the same degree of matching loci was one in four quadrillion. *Id.* The three reportable loci from the checkbook likewise matched the corresponding loci in Petitioner's DNA profile. *Id.* The probability of selecting a random, unrelated, African-American male with the same degree of matching loci was one in 211.7. *Id.*

## B.    Petitioner's Trial

Phillips was charged with first-degree felony murder following the DNA testing, approximately 22 years after Tarver's murder. *Id.* at *1 & n.1 (citing Mich. Com. Laws § 750.316(1)(b) and explaining that Phillips was not charged with the underlying offense of breaking and entering). At the August 2010 trial, Prosecutor Augustus Hutting presented the above-described blood, DNA, and fingerprint evidence through the testimony of Kimber, Lytle, Maggert, Summers, Halvorson, and McCleary. *Id.* Several other DPD officers testified about

---

[3] The DPD collected Petitioner's DNA for testing in 2009.

responding to the scene and collecting evidence, including Officer David Newkirk and Sergeant James A. Bivens, the latter of whom oversaw the crime scene investigation. Lieutenant Charles Braxton testified about executing a search warrant at Petitioner's residence in March 1987. His testimony included the following exchange with Hutting:

> [Hutting:]    Okay. All right. And does the file also reflect that a search warrant was executed at 9074 Westwood in the city of Detroit?
>
> [Braxton:]    Yes.
>
> [Hutting:]    Okay. And was a jacket seized during the course of the execution of that search warrant?
>
> [Braxton:]    Yes.
>
> [Hutting:]    Okay. And was that turned over to anybody?
>
> [Braxton:]    That was taken to the crime lab as well.

Officer Barbara Kozloff from DPD's Cold Case Squad testified about testing the evidence collected in 1987 for DNA and about the collection of a buccal swab from Phillips for DNA testing. Kozloff also explained that the jacket mentioned by Braxton had been destroyed by the time her unit became involved with the Tarver case. Finally, the prosecution presented as witnesses Tarver's daughter (Erica Ridley), Tarver's girlfriend at the time of his death (Debra Moorer), and Tarver's brother (Edgar Tarver). Phillips was represented at trial by Sequoia DuBose, who called only one witness: Phillips's sister, Ms. Allen.

During his closing statement, DuBose argued that the evidence had been contaminated and was not properly analyzed. He also implied that Petitioner's brother Bobby could be a suspect, because his DNA would likely be similar to Petitioner's DNA. DuBose brought up the jacket to say that it was unclear who owned the jacket and whose blood was on the jacket. Hutting responded to these arguments about the jacket during his rebuttal closing statement:

> And then, of course, we have the jacket and the clothes. He says, well, where is the murder weapon? That got tossed away. Plenty of time to get that tossed away.

Where is the clothes? You know, why doesn't the prosecutor have the bloody clothes that Mr. Phillips had on and connect it up that way. That's because if you saw blood and you got blood on you during the course of this beating, the last thing that you're gonna do, okay, is keep those clothes. You're gonna get rid of them. You're gonna get rid of them.

But maybe he made a mistake because [of] that jacket. You know, we got the jacket. First of all, it comes out of the defendant's home. That's where he was living. It's a large size jacket. And what do we have on the inside of it? We have O blood. We have O blood. Is it the deceased['s] blood or is it the defendant's blood? I really can't tell you that. It's possible it could be either one of those, all right.

It's possible that it could very well be the defendant's blood after he was cut and everything, stuck his hand back in the jacket and got it there. Something that you would overlook. But Paula Lytle didn't overlook it. She found it. But, of course, then it's not the defendant's jacket because even though it came out of his house, even though that's where he lived, all right, that's just not his jacket. That's not his jacket.

The jury returned a guilty verdict for first-degree felony murder, and Phillips received a mandatory sentence of life without parole.

## C.    Post-Conviction Proceedings

Phillips, represented by different counsel, filed a motion for a new trial in March 2011, which prompted a series of post-conviction evidentiary hearings before the trial judge. The motion explained that the jacket discussed at trial had actually been seized in 1986, the year before Tarver's murder, during an entirely different investigation:

Defendant attached documentation to his motion to support his argument that police did not seize the jacket from his residence after the murder. Specifically, a DPD laboratory technician report indicated that the laboratory received the jacket on March 12, 1987, from Officer Kramer. Police executed a search warrant at defendant's home on March 11, 1987, at 9074 Westwood. However, the search warrant return indicated that police did not seize anything during the search. In addition, Officer Kramer wrote a memorandum on April 16, 1987, wherein he indicated that police did not seize anything during the search.

*Phillips*, 2013 WL 2223388, at \*4. Although not made part of the record or discussed by the Michigan Court of Appeals, it appears that another document, a property card from a September 11, 1986 DPD search of the 9074 Westwood address, confirms that the jacket was seized at that time.

The trial court acknowledged the jacket error at the first post-conviction hearing. At the second post-conviction hearing, Braxton stated that the "file" he referred to during his trial testimony was the laboratory report created by the forensic serologist, Paula Lytle. He also stated that he could not specifically recall the events of 1987 and thus depended on Lytle's laboratory report at trial. On cross-examination, Braxton confirmed that nothing in the report indicated when the jacket was seized, only the date on which it arrived at the laboratory for testing. Defense counsel DuBose also testified at the evidentiary hearing. He asserted that he had tried to object to the introduction of the jacket because it was unrelated to Tarver's death, and he explained the ways in which the prosecution used the jacket at trial to connect Phillips to Tarver's murder.[4]

Prosecutor Hutting testified at the third post-conviction hearing. He acknowledged that he had seen the March 1987 search warrant return for Petitioner's residence, which stated that nothing was taken and thus seemed to contradict Lytle's laboratory report, but he believed this to be a mistake by the DPD.[5] Hutting maintained that he did not know when the jacket had actually been seized until reading Petitioner's motion for a new trial.

Phillips testified at the fourth post-conviction hearing. He stated that he informed his trial counsel, DuBose, that the jacket had been seized in 1986, before Tarver's death, but that DuBose

---

[4] DuBose also discussed why he did not call a rebuttal DNA expert or other witnesses, but the testimony does not bear on the issues in the COA.

[5] The laboratory report is not necessarily wrong; it merely indicates that the jacket *arrived* for testing on March 12, 1987. But the Kramer Memo and the search warrant return from March 11 state that nothing was taken from Phillips's home. The inconsistencies between these documents raise questions about how and why the jacket ended up at the laboratory the day after the search warrant was executed.

"did nothing about it." Phillips also stated that DuBose knew the jacket was unrelated because DuBose had represented him in relation to a 1986 assault charge, the investigation of which resulted in the jacket's seizure. DuBose resumed his testimony at the fifth post-conviction hearing. He provided very little new information, however, because he invoked attorney-client privilege and refused to disclose anything Phillips told him in the course of the Tarver investigation.

The trial court denied the motion for a new trial in its entirety. Phillips appealed on the same grounds asserted in his motion for a new trial, and the Michigan Court of Appeals affirmed his conviction in May 2013. *Phillips*, 2013 WL at 2223388, at *17. The Michigan Supreme Court denied leave to appeal in October 2013. *People v. Phillips*, 838 N.W.2d 151 (Mich. 2013) (mem.).

Phillips filed a § 2254 habeas petition in the Eastern District of Michigan on January 21, 2015. Applying AEDPA to its review of the decision of the Michigan Court of Appeals, the district court denied relief and denied Phillips a certificate of appealability (COA). Phillips filed a timely application for a COA, and this court granted the application in part. Now before the panel are Petitioner's claims regarding his right to present a defense, the Confrontation Clause, prosecutorial misconduct, and ineffective assistance of counsel.

## II.    ANALYSIS

### A.    Jurisdiction and Standard of Review

The panel has jurisdiction to hear Phillips's appeal because the district court entered a final appealable order and because this court granted Phillips a COA. 28 U.S.C. § 2253. This court reviews a district court's legal conclusions and mixed questions of law and fact de novo and reviews the district court's factual findings for clear error. *Hodges v. Colson*, 727 F.3d 517, 525 (6th Cir. 2013) (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999)).

This case is governed by AEDPA, which permits relief "with respect to any claim that was adjudicated on the merits in State court proceedings" only where the state court resolution was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court's decision would be considered contrary to established law if it is diametrically different from or opposite in character or nature to federal law as determined by the Supreme Court." *Akins v. Easterling*, 648 F.3d 380, 385 (6th Cir. 2011) (alterations, citation, and internal quotation marks omitted). "[H]abeas relief is available under the unreasonable application clause if the state court unreasonably applies that principle to the facts of the prisoner's case or unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Id.* (citation and internal quotation marks omitted). In order to warrant habeas relief, "the state court's application of clearly established law must be objectively unreasonable" and not just "erroneous[ ] or incorrect[ ]." *Id.* at 385–86 (alteration, citation, and internal quotation marks omitted).

This deferential standard of review applies only to claims that the state court "adjudicated on the merits." 28 U.S.C. § 2254(d). The Michigan Court of Appeals deemed the right to present a defense, Confrontation Clause, and prosecutorial misconduct claims "unpreserved" and applied plain error review. We have reached varying conclusions as to whether plain error review by a state court constitutes adjudication on the merits. *Compare Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014) ("We have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference."), *with Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009) (rejecting dissent's argument that de novo review applies to

claims resolved by state courts via plain error review), *and Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017) (applying AEDPA deference to plain error review and explaining that recent Supreme Court precedent "obligates us to presume that the state court adjudicated the claim on the merits in ambiguous situations" (alteration, citation, and internal quotation marks omitted)). This ambiguity does not affect our decision, however, because none of Petitioner's unpreserved claims can survive even de novo review. *See Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015) ("We need not enter this debate, however, because we hold that under either standard of review, AEDPA deference or de novo, Juror 139 was not an automatic death penalty juror."). The stand-alone claim for ineffective assistance of counsel was properly preserved and raised before the Michigan Court of Appeals and therefore falls within AEDPA's purview.[6]

**B.** **Right to Present a Defense**

Phillips argues that the trial court's limitations on his cross-examination of Officer Kimber and his sister, Carmen Allen, prevented him from presenting a complete defense in violation of his Sixth Amendment rights. An accused has the right at trial to present testimony that is "relevant," "material," and "vital to the defense." *Washington v. Texas*, 388 U.S. 14, 16, 23 (1967). This right is not absolute, "but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). State evidentiary rules that exclude evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *Rock v. Arkansas*, 483

---

[6] Michigan asks the court to find Petitioner's right to present a defense, Confrontation Clause, and prosecutorial misconduct claims procedurally defaulted. Even if those claims were defaulted, their default could be excused by Phillips's stand-alone ineffective assistance of counsel claim, which, as explained below, would prevail under de novo review. *See, e.g.*, *Hall v. Vasbinder*, 563 F.3d 222, 236–37 (6th Cir. 2009) ("An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. The latter must meet the higher AEDPA standard of review, while the former need not." (citations omitted)); *see also Joseph v. Coyle*, 469 F.3d 441, 462–63 (6th Cir. 2006) ("[E]stablishing Strickland prejudice likewise establishes prejudice for purposes of cause and prejudice."). Because we would reach the merits of those claims regardless of default, we proceed straight there.

U.S. 44, 56 (1987)). The "[e]xclusion of evidence only raises constitutional concerns if it has 'infringed upon a weighty interest of the accused.'" *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004) (quoting *Scheffer*, 523 U.S. at 308). Accordingly, the trial court's limitation on the cross-examinations of Kimber and Allen does not implicate Petitioner's constitutional rights unless the resulting exclusions infringed upon a weighty interest.

Here, Phillips challenges three evidentiary decisions.[7] First, he argues that his cross-examination of Officer Kimber was improperly circumscribed when the trial court excluded a question about possible contamination of the saline solution that was used to collect evidence from Tarver's house. After confirming that other officers shared the same saline solution, trial counsel, DuBose, asked "if somebody accidentally touches some blood or a surface with the saline solution or it drops from someone's hand you have no means of—" before the prosecutor objected. The prosecutor asserted that this question called for "speculation," and the trial court agreed that it was "sort of a meaningless hypothetical." DuBose also asked Kimber where evidence-gathering materials were stored, but the court cut off that line of questioning as "just totally speculative." These rulings might have infringed upon a weighty interest if DuBose had been unable to elicit any testimony about contamination. That was not the case. The trial court permitted DuBose to ask about how things were stored and to what extent investigators wore and changed gloves over the course of collecting blood evidence, both in general and specifically at Tarver's house. DuBose also discussed contamination with Kimber at other points. He elicited fairly thorough testimony about Kimber's collection practices and the various points at which evidence might have been contaminated. This testimony made clear that the evidence kits were shared and that others had access to the same saline solution that Kimber used. DuBose was then able to use Kimber's

---

[7] The COA noted limited "cross-examination of three witnesses" but analyzed the cross-examination of only two witnesses. Presumably the reference to three comes from the number of challenged limitations.

testimony to make contamination arguments to the jury during his closing statement. Accordingly, the trial court's limitation did not arbitrarily exclude important evidence.

Phillips next challenges two limitations related to his cross-examination of Phillips's sister, Tarver's former girlfriend, Ms. Allen. The first challenge relates to Phillips's defense theory that Tarver's house was disorderly, such that a bloody tissue might not have been thrown away for some time. DuBose asked Allen about the condition of Tarver's house after they broke up, intending to contradict previously elicited testimony that Tarver was a "neat freak." The trial court limited this testimony only insofar as it required DuBose to first lay a foundation. DuBose asked Allen to clarify when, subsequent to the breakup and before the murder, she had last observed Tarver's house. DuBose was then able to elicit testimony from Allen that she observed the house "in disarray" after she moved out because she had done "all the cleaning up." Thus, trial counsel succeeded in questioning Ms. Allen about the condition of Tarver's house.

Third, Phillips sought to question Allen about other instances after the breakup that she knew Phillips to have been in Tarver's house. DuBose asked her, "after you broke up, are you aware of any circumstances under which Mr. Phillips would have been around or Mr. Tarver or [Tarver's] house . . . ?" Upon an objection from the prosecutor and an instruction to avoid "hearsay" from the court, trial counsel added, "[a]nd I'm talking about from your personal knowledge." Allen then testified that she knew Phillips went to Tarver's house to pick up a stove hood the week after the breakup (November 1986) because it was at her request. Trial counsel was therefore able to confirm that Phillips had been inside Tarver's house at least once after the breakup.

All said, the above limitations on cross-examination did not actually prevent Phillips from eliciting testimony in support of his arguments about contamination, the state of Tarver's house,

or whether Phillips had been to the house after the breakup. Petitioner's substantial rights were not implicated by these evidentiary decisions, and therefore none of these limitations rises to the level of a constitutional violation.

### C. Confrontation Clause

In his second claim, Phillips argues that Braxton's reliance on the file to testify about the jacket violated the Confrontation Clause of the Sixth Amendment. The Sixth Amendment protects the right of an "accused" to be "confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has instructed that this clause permits the introduction of testimonial statements from non-testifying witnesses "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004) (footnote omitted). The "file" on which Braxton relied was Lytle's laboratory report. "Reports memorializing the work performed by laboratory analysts when carrying out forensic duties are testimonial statements subject to the requirements of the Sixth Amendment, as interpreted by *Crawford*." *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015) (citing *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11 (2009)). Phillips is therefore correct to point out that Officer Braxton's reliance on the laboratory report could conceivably be vulnerable to Sixth Amendment criticism. But his position necessarily fails for one key reason: The declarant who authored the report, Ms. Lytle, testified at trial and was subject to cross-examination. Accordingly, the trial court did not allow in a testimonial statement from a non-testifying declarant, and there is no Confrontation Clause problem.

### D. Prosecutorial Misconduct

Phillips argues that the prosecutor elicited "false testimony about a damaged jacket with bloodstains, destroyed by the time of trial," and, in so doing, "had his witness directly mislead the jury." Phillips asserts that prosecutor Hutting's elicitation of false testimony from Braxton was

knowing and deliberate. The State responds by highlighting Hutting's testimony from the post-conviction evidentiary hearing, where he stated that he honestly but mistakenly believed that the jacket was seized just after Tarver's death.

To demonstrate prosecutorial misconduct, a petitioner must show that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)); *see also Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009) (applying the same standard for a claim arguing that the prosecutor failed to correct false testimony).[8] This case turns on the third element. Everyone agrees that the jacket had nothing to do with Tarver's murder and, for reasons explored below, its admission was material. But nothing in the record supports a finding that Hutting knew that the jacket had been seized in 1986, before Tarver died. He consistently maintained that he learned of the error only after trial, when Phillips disclosed it in his motion for a new trial. Indeed, when questioned by post-conviction counsel, Hutting testified:

> [Counsel:] Okay. Do you now agree that the jacket does not have any genuine legitimate bearing on the question of whether Anthony Phillips committed the charged homicide of Lacey Tarver?
>
> [Hutting:] Yes, I would agree with that. And had I known that at the time of the trial, I would not have put the evidence in about the jacket.

Beyond the actual falsity of the jacket-related testimony, Phillips has not presented any evidence that Hutting knowingly sought to present false evidence, and nothing in the record supports that

---

[8] This circuit has left open the possibility that a prosecutorial misconduct claim may lie where the record reveals that "any competent prosecutor would have" uncovered the falsity of the witness's testimony, such that actual knowledge of falsity may be imputed. *Thomas v. Westbrooks*, 849 F.3d 659, 667 (6th Cir. 2017). Phillips did not raise or develop this theory of liability, so we decline to address it. *See Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010) (deeming waived issues not covered by a party's brief).

conclusion. At most, the record reveals that Hutting was less than diligent in his review of the investigatory file. This carelessness is cause for concern, to be sure, but what Hutting should have known is insufficient to support a prosecutorial misconduct claim in this circuit. *See Thomas*, 849 F.3d at 667 (rejecting a recklessness or "should have known" standard for prosecutorial misconduct claims). Phillips's prosecutorial misconduct claim therefore fails.

### E.    Ineffective Assistance of Counsel

Finally, Phillips claims DuBose rendered ineffective assistance of counsel. Phillips argues that trial counsel performed deficiently by failing "to investigate, object to, and present counter-evidence to, the claim that the jacket had any connection to the case at all." A claim of ineffective assistance of counsel has two prongs. The deficient performance prong asks whether counsel's performance "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The prejudice prong asks whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Before turning to the merits of this claim, we pause to again consider the level of deference owed to the Michigan Courts of Appeals. That court acknowledged that "counsel's performance in investigating the seizure of the jacket may have fallen below an objective standard of reasonableness," but did not actually evaluate that prong. Instead, the Court of Appeals cabined its analysis to *Strickland*'s prejudice prong. *People v. Phillips*, No. 300533, 2013 WL 2223388, at *15 (Mich. Ct. App. May 21, 2013) (finding that "the jacket evidence did not affect the outcome of the proceedings"). This circuit has explained that "[w]hen a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court." *Rayner v. Mills*,

685 F.3d 631, 638 (6th Cir. 2012); *see also Moss v. Olson*, 699 F. App'x 477, 481–82 (6th Cir. 2017) (explaining why this split standard still applies by reconciling *Harrington v. Richter*, 562 U.S. 86, 99 (2011), with *Rompilla v. Beard*, 545 U.S. 374 (2005)). Accordingly, AEDPA governs our review of *Strickland* prejudice, but we consider the deficient performance prong de novo.

### 1. Deficient Performance

We first consider whether DuBose's failure to object to the jacket fell below an objective standard of reasonableness. During the post-conviction proceedings, DuBose asserted that he objected to the admission of the jacket. He testified that he had asked Hutting about the jacket before trial and learned that the jacket "had been destroyed." He also testified that he "was specifically told that that jacket was taken as part of that [March 1987] search, and that it had bullet holes in it and it was blood that was in it." DuBose stated that he pursued more information about the jacket because Phillips had told him "that the jacket had to do with something unrelated to this," so he "tried to challenge the jacket from that point of view." DuBose went on:

> I clearly knew that this jacket had nothing to do with this case whatsoever; that that blood had nothing to do with this case and that it had to do with bullet holes from something totally unrelated. Mr., me and Mr. Phillips and I, we talked about that and I tried to, to—I tried to challenge that.

However, this post-trial testimony is contradicted by the transcript from the trial transcript. DuBose did ask the court to exclude the jacket just before jury selection began, but the transcript reveals that his objection was limited to the tenuous relevance of the blood on the jacket and that he actually described the jacket as being seized at the time of the murder:

> There was a search warrant back in '87 done on the Westwood address. And in that search warrant—and the Westwood address is an address attributed to the family of Mr. Phillips. . . . And when they searched—it didn't dawn on me until really over the weekend, and I apologize for not bringing this issue up earlier. They found a jacket inside the residence that had, the way the report read, appeared, what

> appeared to be bullet holes in it. And the jacket also had some blood on it. . . . The problem I have, your Honor, is I—now, it dawned on me over the weekend is he gonna try to suggest that there's—because there's blood—this jacket had a—the bullet holes has blood on it, that it had to have something to do with the crime that we're dealing with here.

DuBose then raised his concerns with admitting the jacket into evidence, stating that there was "no confirmation that it's Mr. Phillips' jacket" and that "the jacket was destroyed and there's no DNA from the jacket which would pinpoint specifically as Mr. Phillips' DNA." Crucially, DuBose did not mention that the police actually seized the jacket in 1986, in relation to a completely different investigation. Moreover, this morning-of-trial testimony about his "weekend" realization undermines DuBose's post-conviction contentions that he had contacted Hutting about the jacket in advance of trial and that he had tried to exclude the jacket as unrelated to Tarver's murder.

Nothing else in the record indicates that DuBose remembered that the jacket had been seized in 1986, before Tarver's murder, or that he attempted to alert others to the confusion. Hutting testified that no one informed him of any issues with the jacket and that he was entirely unaware of the error until he received Petitioner's motion for a new trial. Hutting also never mentioned any jacket-related conversations with DuBose. Phillips testified that when he raised concerns about the jacket, DuBose "did nothing about it." The record therefore supports the conclusion that DuBose failed to object to the jacket because he failed to apprehend that it was unrelated to Tarver's murder.

To the extent that this misapprehension flows from DuBose's failure to investigate, this conduct fell below the objective standard of reasonableness. Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to

-17-

counsel's judgments." *Strickland*, 466 U.S. at 691; *see also Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." (citations omitted)).

Here, there is no evidence that DuBose even identified, let alone investigated, the discrepancy between the March 11 search warrant return, which matched Officer Kramer's April 16 memo, and the March 12 lab report. The lack of an objection to the jacket's admission stemmed from his ignorance, not from strategic thinking. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (noting, in a pre-AEDPA case, that counsel performed deficiently when the "failure to request discovery . . . was not based on 'strategy'"). DuBose's conduct is therefore "not entitled to deference." *Moss v. Hofbauer*, 286 F.3d 851, 865 (6th Cir. 2002); *see also Dando v. Yukins*, 461 F.3d 791, 799 (6th Cir. 2006) (explaining that "where a failure to investigate does not reflect sound professional judgment, such deference is not appropriate"). Indeed, DuBose's oversight is particularly troubling given that DuBose had represented Phillips in relation to the 1986 investigation, when the jacket was actually seized, and that Phillips had reminded him of this fact.

The failure to investigate the discrepancy between the documents is comparable to other conduct that we have placed below the objective standard of reasonableness. For example, in *Couch v. Booker*, the court held that counsel's performance was deficient where counsel failed to read a fire department report that included information critical to a defense available to the petitioner. 632 F.3d 241, 248 (6th Cir. 2011). There, the petitioner brought the report to his counsel's attention, but, just as DuBose apparently failed to heed Phillips when he flagged the jacket, the petitioner's attorney did not pursue it. *Id.* at 246. Timely review of the report "would

have led reasonable counsel to the same evidence that [the petitioner's] postconviction counsel found, which was 'easy to get' and which reasonably diligent trial counsel 'would presumably ha[ve] unearthed.'" *Id.* at 248 (quoting *Rompilla*, 545 U.S. at 391, 393). Similarly, a timely and adequate inquiry into the jacket likely would have revealed the discrepancy between the search warrant return and the lab report, thus giving DuBose a hook to exclude the jacket, just as Petitioner's post-conviction counsel was able to demonstrate the impropriety of its admission. *See Byrd v. Trombley*, 352 F. App'x 6, 10–12 (6th Cir. 2009) (explaining that "[h]ad [the petitioner's] attorney researched the facts and law concerning [his] prior conviction, he likely would have objected to the introduction of the prior conviction as inadmissible" and therefore holding that "defense counsel's performance was deficient because he introduced and failed to object to the previous conviction despite its potential inadmissibility").

We have also acknowledged a line of Supreme Court cases finding deficient performance where "evidence in the record suggested fruitful leads that a reasonable attorney would have pursued." *Jackson v. Warden*, 622 F. App'x 457, 462 (6th Cir. 2015) (citing *Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Porter v. McCollum*, 558 U.S. 30, 40 (2009)). Here, DuBose had three leads: his own knowledge of the 1986 investigation; Petitioner's recollection of the jacket; and a discrepancy between the key investigative documents in a limited police file. These leads, if followed, would have enabled defense counsel to exclude the only piece of blood evidence collected outside the murder location and therefore would qualify as fruitful. DuBose's failure to investigate these leads in an effort to exclude the jacket rises to the level of deficient performance.

In sum, the record demonstrates that DuBose failed to apprehend that the jacket had no bearing on Tarver's death, even in the face of a discrepancy in the file, Petitioner's explicit warning, and his own knowledge from his 1986 representation of Phillips. Under these

circumstances, DuBose's failure to investigate the jacket and object to its admissibility as unrelated to Tarver's death constitutes deficient performance. *See Richey*, 498 F.3d at 362.

### 2. Prejudice

The prejudice inquiry asks whether, but for counsel's deficient performance, it is "reasonably likely" the result would have been different. *Strickland*, 466 U.S. at 696. Under AEDPA, federal courts evaluate whether it was "unreasonable" for the state court to conclude that a petitioner's "evidence of prejudice fell short of this standard." *Harrington*, 562 U.S. at 112. A federal court cannot overrule a state court simply because the federal court would reach a different conclusion. *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). In this posture, our inquiry is limited to "whether the [Michigan] Court of Appeals' determination is an unreasonable application of clearly established Federal law." *Id.* (citation and internal quotation marks omitted); *see also Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

The Michigan Court of Appeals addressed the jacket's effect on the trial multiple times. In rejecting Petitioner's prosecutorial misconduct claim, it explained:

> Here, the jacket was of low probative value. As defense counsel argued, the prosecution could not establish that it belonged to defendant. The jacket had two suspected bullet holes through it, but there was no evidence that Tarver's murder involved the use of a gun or that there was a struggle. Instead, other evidence directly linked defendant to Tarver's murder, including his fingerprint on the Band-Aid box, the bloody tissue, and the blood on the checkbook. This evidence standing alone was more than sufficient to allow a rational juror to convict defendant beyond a reasonable doubt.

*Phillips*, 2013 WL 2223388, at *12. With regard to DuBose's failure to object to Braxton's testimony, the Michigan Court of Appeals reiterated:

> [C]ounsel's failure to object did not impact the outcome of the trial. Here, evidence of the jacket was of low probative value where there was other evidence that defendant's blood was at the crime scene and where there was no evidence that the murder involved a gun.

*Id.* at *15 (citation omitted). The court repeated this conclusion yet again when addressing Petitioner's claim that DuBose performed deficiently by failing to object to the prosecution's introduction of the jacket:

> [T]he trial court did not clearly err in finding that admission of evidence regarding the jacket did not affect the outcome of the proceeding. As discussed above, the jacket evidence did not affect the outcome of the proceedings. The evidence was of low probative value and there was significant other evidence that would have allowed the jury to conclude that defendant killed Tarver including DNA and fingerprint evidence. On this record, defendant cannot show that there is a reasonable probability that but for counsel's failure to object to the jacket evidence, the result of the proceeding would have been different.

*Id.* (citation omitted).

These conclusions are not without flaw. The jacket was the only piece of blood evidence found outside the murder scene, and the trial testimony indicated that it was found at Petitioner's residence in the days after Tarver died. The blood stains on the jacket could have matched either Phillips or Tarver, and the jury could have concluded that the blood related to the murder. Even if the jury instead believed that the blood related to the bullet holes in the jacket—and so was not linked to the murder, which was committed with a hammer—the jacket still contributed to a portrayal of Phillips as a violent person. The State points out that the jacket played a relatively minor role in the trial proceedings. But minimal airtime does not necessarily translate into minimal probative value. Indeed, at least three witnesses—Lytle, Braxton, and Kozloff—were asked about the jacket. The jacket's repeated resurfacing throughout the trial signaled its importance. Additionally, Prosecutor Hutting made creative use of the jacket during his rebuttal closing statement, the last thing jurors heard from either side before receiving the jury instructions and beginning their deliberation. In a trial where the evidence established only that Phillips was very likely bleeding while at Tarver's house at some unknown time, but did not directly link him to the

murder itself, the jacket's addition undermines confidence in the outcome, and thus creates and reasonable probability that the outcome would have been different. For these reasons, if we were reviewing this prong de novo, we would hold that the admission of the jacket prejudiced Phillips.

But the inquiry before us is not whether we agree with the Michigan Court of Appeals, but instead whether that court's resolution was "objectively unreasonable." *Akins*, 648 F.3d at 386. This is a close call, but we ultimately conclude that it was not. The Michigan Court of Appeals considered the jacket at multiple points and noted that, even without the jacket, the rest of the physical evidence directly linked Phillips to the scene of the murder. And given that the murderer's identity was the key issue at trial, it is reasonable to find that the probative value of these direct links outweighed that of the jacket. Put another way, in the face of the other evidence presented at trial, the Michigan Court of Appeals did not unreasonably apply *Strickland* when it determined that the inclusion of the jacket did not prejudice Phillips. *Cf. Peoples v. Lafler*, 734 F.3d 503, 515 (6th Cir. 2013) (finding state court resolution of *Strickland* prejudice unreasonable where the state court "ignored the extent to which the government relied on" false testimony, the impeachment of which "certainly could have led to exoneration"); *Higgins v. Renico*, 470 F.3d 624, 634 (6th Cir. 2006) (finding state court resolution of *Strickland* prejudice unreasonable where the state court rejected it without explanation or analysis).

Because the decision of the Michigan Court of Appeals was not objectively unreasonable, Phillips's ineffective assistance of counsel claim does not warrant relief under AEDPA.

### III. CONCLUSION

This case is certainly troubling. The prosecution tried Phillips for a murder that had happened more than twenty years before, even though they had declined to charge him at the time of the murder. The attorneys on both sides, DuBose and Hutting, overlooked a documentary

discrepancy that diligent lawyering should have revealed, and, as a result, the jury heard inculpatory testimony about a jacket that had absolutely nothing to do with the crime alleged. While these errors rest squarely on the lawyers' shoulders, it is Phillips who bears the consequences. Yet because there is no evidence that Hutting knew of the jacket's irrelevance, and because the Michigan Court of Appeals was not unreasonable in its application of *Strickland*—even if it reached the incorrect result—we are bound to **AFFIRM**.

**KAREN NELSON MOORE, Circuit Judge, dissenting in part.** There were four key pieces of physical evidence introduced at Anthony Phillips's trial for the murder of Lacey Tarver. First, there was his fingerprint on a Band-Aid box in Tarver's bathroom. *People v. Phillips*, No. 300533, 2013 WL 2223388, at *2 (Mich. Ct. App. May 21, 2013). Second, there was a tissue with blood on it in the kitchen; "the probability of selecting an unrelated, random, African-American individual" with the same DNA found on the tissue "was one in four quadrillion." *Id.* at *2–3. Third, there was blood found on a checkbook inside a dresser drawer in the bedroom. *Id.* at *2. "[T]he probability of selecting an unrelated, random, African-American individual with the same DNA profile as the checkbook blood" was much higher: "one in 211.7 people." *Id.* at *3. Finally, there was the jacket. Found in the defendant's house—purportedly during a search by the police following Tarver's murder—the jacket had two suspected bullet holes in the left shoulder and had type O blood on the inside. *Id.* at *4. Both Tarver and Phillips had type O blood. *Id.* at *2.

But, as everyone now agrees, the jacket had nothing to do with Tarver's murder. *Id.* at *4–5. As the majority's reasoned analysis demonstrates, Maj. Op. at 16–20, Anthony Phillips's trial counsel was constitutionally deficient when he failed to investigate the jacket and object to its admissibility. That leads to the next question: If Phillips's trial counsel had properly investigated the jacket and objected to its admission, is there "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt"? *Strickland v. Washington*, 466 U.S. 668, 695 (1984). Even under our deferential standard of review, I believe that the answer is yes. I therefore respectfully dissent from Parts II.E.2 and III of the majority opinion and concur in all other parts.

**I.**

"[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694). In determining prejudice, a court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. Because the Michigan Court of Appeals considered the prejudice prong, *Phillips*, 2013 WL 2223388, at *15, our review of its analysis is through "the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)).

**II.**

If trial counsel had properly investigated and objected to the jacket, it would have been excluded as irrelevant evidence. MICH. R. EVID. 401. Thus, our narrow inquiry on habeas review in evaluating prejudice is: Whether the state court's conclusion—that, even without the jacket, there was no "reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695—was "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). A review of the record reveals that it was.

In its very terse analysis of the prejudice arising from the introduction of the jacket, the Michigan Court of Appeals concluded that the jacket "was of low probative value and there was significant other evidence that would have allowed the jury to conclude that defendant killed Tarver including DNA and fingerprint evidence." *Phillips*, 2013 WL 2223388, at *15. But the

-25-

state court's description of the other evidence linking Phillips to the murder as "significant" is a vast overstatement. The other evidence was the tissue found in the kitchen, the checkbook found in a dresser drawer in a bedroom, and the Band-Aid box in the bathroom. *Id.* at *2. Together, this evidence proved that Phillips had been in Tarver's house some time before the murder, and during that time he had touched the Band-Aid box and had bled (although not necessarily on the same visit). But there was no dispute that Phillips had been in Tarver's house before the murder. When Phillips's sister Carmen Allen was dating Tarver, Phillips and his father "did all the plumbing, painting, and other work around the house." *Id.* at *1. When Allen moved out of the house—about four months before the murder—Phillips helped her retrieve her belongings. *Id.* And a week before the murder Phillips went to Tarver's house to retrieve a stove hood. *Id.* During any of these activities, Phillips may have cut himself and may have touched the Band-Aid box. Thus, all of this evidence merely proves that Phillips had been in Tarver's house—a fact not in dispute and not inculpatory. Furthermore, there was fingerprint evidence that an individual—whose prints "neither matched [the] defendant nor Tarver"—had been in the house. *Id.* at *3.

We have previously held that when defense counsel's performance is deficient with respect to a key piece of evidence, it can be an unreasonable application of *Strickland* for the state court to conclude that there was no prejudice. *Peoples v. Lafler*, 734 F.3d 503, 515 (6th Cir. 2013) (finding unreasonable the state court's conclusion that there was no prejudice arising from defense counsel's failure to impeach two key witnesses when the prosecution's case without this testimony was comprised of only circumstantial evidence, namely that the murder weapon was found in a car with the defendant and two others); *Higgins v. Renico*, 470 F.3d 624, 634–36 (6th Cir. 2006) (holding that a state court's conclusion that there was no prejudice was unreasonable when defense counsel failed to cross-examine the key prosecution witness whose credibility was extremely

suspect). This case is analogous. There was very little evidence linking Phillips to the murder. The bloody jacket was the most inculpatory piece of evidence; without it, the prosecution's case is equally as consistent with innocence as with guilt. Thus, there is a reasonable probability that, without the introduction of the jacket, the result of the trial would have been different. *Strickland*, 446 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

The majority holds that the state court's contrary analysis was not unreasonable because "the murderer's identity was the key issue at trial." Maj. Op. at 22. That may be true, but the other evidence does not establish the murderer's identity. The fingerprint and blood establish only that Phillips was in Tarver's house at some point in time—which was not disputed, because Phillips had visited the house frequently and recently for legitimate reasons. There is no connection between this evidence and the murder, except that the items were located at the home where the murder occurred. Mere presence in a murder victim's house at some point in time, however, does not prove guilt of murder beyond a reasonable doubt. This is especially true when the physical evidence also proves that an unidentified third party was also present—again, at an undetermined time—at the scene of the murder. *Phillips*, 2013 WL 2223388, at *3.

Consequently, the state court's conclusion that there was not a "reasonable probability" that the jury "would have had a reasonable doubt," *Strickland*, 466 U.S. at 695, was "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). In conducting its analysis, the state court said that the "DNA and fingerprint evidence[] was overwhelming" evidence of Phillips's guilt, without considering what this evidence actually shows. The evidence speaks overwhelmingly to the fact that Phillips was in Tarver's house at some point in time and is entirely silent as to whether Phillips was the

murderer. Furthermore, the fingerprint evidence demonstrates that there was an unidentified third ssparty at the murder scene as well. In sum, the state court's consideration of the evidence unreasonably inflated the probative nature of the remainder of the prosecution's case against Phillips and was, therefore, an unreasonable application of *Strickland*. *Cf. Porter v. McCollum*, 558 U.S. 30, 42–44 (2009) (holding that the state court "unreasonably discounted" relevant mitigation evidence and thus its conclusion that the defendant was not prejudiced by his counsel's constitutional deficiencies was an unreasonable application of clearly established federal law). Thus, I respectfully dissent from the majority's denial of habeas relief on Phillips's ineffective-assistance-of-counsel claim.

**KETHLEDGE, Circuit Judge, concurring in the judgment.** Although I agree with much of the majority's analysis, I respectfully part ways on a couple of points. First, I think that our decision in *Stewart v. Trierweiler*, 867 F.3d 633 (6th Cir. 2017), resolves the ambiguity mentioned at page 10 of the majority opinion. Specifically, I think that *Stewart* makes clear that plain-error review by a state court counts as an adjudication on the merits for purposes of 28 U.S.C. § 2254(d). *See* 867 F.3d at 638. Second, I respectfully disagree with the majority's dicta that DuBose performed deficiently when he failed to object to the jacket's admission on the ground that it had been seized in 1986 rather than 1987. According to DuBose, the prosecutor told him the jacket was seized in the 1987 search, which is consistent with the prosecutor's post-conviction testimony about what he believed at the time. Moreover, DuBose himself never said that Phillips told him that the jacket had been seized in 1986; only Phillips himself suggested as much, and we are in no position to make a credibility determination on that point. And DuBose testified that he did ask the prosecutor about the discrepancy between the March 11 search-warrant return and the March 12 lab report, and that the prosecutor said the jacket had been seized in 1987. In short, everyone assumed at trial that the jacket had been seized in 1987; DuBose did try to exclude it; and the jacket itself was not crucial to the case. DuBose's performance on this point therefore was not constitutionally deficient.